Tracie HUNTER, et al., Plaintiffs,

v.

**HAMILTON COUNTY BOARD OF ELECTIONS, et al.,
Defendants.**

**Case No. 1:10CV820.**

United States District Court,
S.D. Ohio,
Western Division.

Feb. 8, 2012.

Alphonse Adam Gerhardstein, Jennifer Lynn Branch, Gerhardstein & Branch Co. LPA, Cincinnati, OH, for Plaintiffs.

James Warren Harper, Colleen Marie McCafferty, David Todd Stevenson, Thomas Edward Grossmann, Cincinnati, OH, for Defendants.

**JUDGMENT AND ORDER**

SUSAN J. DLOTT, Chief Judge.

**TABLE OF CONTENTS**

## TABLE OF CONTENTS

I. INTRODUCTION .................................................799

II. RESOLUTION OF PENDING MOTIONS ...................................801
 A. The Board's Motion for Summary Judgment.............................801
 1. The Board is not immune from suit ..................................801
 2. Plaintiffs have standing .........................................803
 a. As a candidate in the November 2010 election, Hunter has standing to challenge the Board's treatment of provisional votes .......................................................803
 b. NEOCH and ODP have standing to enforce the *NEOCH* Consent Decree ...........................................803
 B. The Board's Motion to Dismiss the Amended Complaint of NEOCH and ODP ..........................................................804
 1. NEOCH and ODP have standing to enforce the *NEOCH* Consent Decree .........................................................804
 2. Rule 12(b)(7) does not require dismissal of NEOCH's Amended Complaint ......................................................804
 3. NEOCH and ODP have stated a claim upon which relief may be granted ........................................................805
 4. The Amended Complaint will not be dismissed for failure to conform to the evidence .........................................805

III. FINDINGS OF FACT................................................805
 A. Ohio Election Law ...............................................805
 1. Statutory Framework ............................................805
 a. Secretary of State ..........................................806
 b. Boards of Elections .........................................806
 c. Election Precincts ..........................................806
 d. Poll Workers ...............................................807
 e. Regular Voting .............................................807
 f. Provisional Voting ..........................................807
 2. *Northeast Ohio Coalition for the Homeless ("NEOCH")* Consent Decree ...............................................809
 3. Ohio Secretary of State Directives .................................810
 B. Hamilton County Board of Elections and the 2010 General Election.....812
 1. The Board ...................................................812
 2. Poll Workers ................................................813
 3. Poll Worker Training .........................................813
 4. The November 2010 General Election ...............................817
 a. Voting at the Board of Elections Office ..........................817
 b. Voting at Polling Places on Election Day .........................818
 5. Processing the Ballots .........................................822
 a. Provisional Ballot Verification..................................822
 b. *NEOCH* Provisional Ballot Review ...........................823
 6. Board Meetings to Accept or Reject Provisional Ballots...............825
 C. *Hunter* and *Williams* Litigation and Subsequent Events .................829
 1. Hunter Initiates this Lawsuit .....................................829

2. Secretary of State Directives and Subsequent Investigation by the Board......829
3. *State ex rel. Painter v. Brunner*......830
4. Subsequent Directives and Orders......831
5. Sixth Circuit Appeal......832

IV. CONCLUSIONS OF LAW......833
 A. Equal Protection......833
 1. Legal Standard......834
 2. Analysis......835
 B. *NEOCH* Consent Decree......841
 C. Due Process......841
 1. Substantive Due Process......841
 a. The Board's Failure to Count Ballots Cast in the Wrong Precinct......842
 b. Failure to Supervise Poll Workers......844
 2. Procedural Due Process......846

IV. CONCLUSION......847

## I. INTRODUCTION

This case arises from the November 2010 election for Hamilton County Juvenile Court Judge between candidates Tracie Hunter and John Williams. Hunter brought a claim under 42 U.S.C. § 1983 for alleged violations of due process and equal protection by defendant Hamilton County Board of Elections ("Board") and its four members in their official capacities ("Defendants") with respect to the Board's review and counting of provisional ballots. Hunter alleged that the Board created a practice of accepting certain provisional ballots that were cast in the wrong precinct because of poll-worker error but did not apply the practice uniformly to all provisional ballots. On November 16, 2010, after the Board completed its count of provisional ballots and added the provisional total to the election day total, Hunter was 23 votes behind Williams.

To provide context for the forthcoming discussion and decision on pending motions, the next few paragraphs briefly describe the events that transpired between the November 16, 2010 vote count and the

final hearing on the merits of Hunter's claims. The Court describes these events in greater detail in the subsequent Findings of Fact.

On November 21, 2010, Hunter sought a temporary restraining order and preliminary injunction prohibiting Defendants from certifying the election results, ordering Defendants to investigate whether poll-worker error contributed to the rejection of other provisional ballots, and ordering Defendants to count all provisional ballots where poll-worker error caused the voter to vote in the wrong precinct. The Court permitted John Williams to intervene as a defendant.[1] The Court also permitted the Northeast Ohio Coalition for the Homeless ("NEOCH") and the Ohio Democratic Party ("ODP") to intervene as plaintiffs. In their complaint, NEOCH and the ODP alleged that, in addition to violating voters' constitutional rights, the Board failed to comply with the terms of a consent decree entered in the case of *Northeast Ohio Coalition for the Homeless [NEOCH] v. Brunner*, Case No. 2:06cv896 (S.D. Ohio) (Marbley, J.) (the "*NEOCH* Consent Decree") with respect to provisional ballots.

The Court held a hearing on November 22, 2010.[2] That night, the Court granted

---

1. The Ohio Republican Party also intervened at the outset of the litigation, but it voluntarily withdrew from the case prior to the permanent injunction hearing.

2. Hunter captioned her motion as one for a temporary restraining order and preliminary

in part Hunter's motion for a preliminary injunction and ordered the Board to immediately begin an investigation into whether poll-worker error contributed to the rejection of 849 provisional ballots that were cast in the wrong precinct and include in the mandatory recount any provisional ballots improperly cast for reasons attributable to poll-worker error.

The Ohio Secretary of State, Jennifer Brunner, issued several directives to facilitate the Board's investigation. Those directives soon became the subject of an action for a writ of mandamus filed against Secretary Brunner by John Williams. *State ex rel. Painter v. Brunner,* 128 Ohio St.3d 17, 941 N.E.2d 782 (Ohio 2011). The Ohio Supreme Court concluded that Secretary Brunner's postelection instructions to the Board of Elections were not justified by Ohio law or this Court's orders. Brunner, a Democrat who had lost her bid for reelection, was then replaced by Republican Jon Husted. Immediately upon taking office, Secretary Husted issued a directive superceding those issued by Secretary Brunner and directing the Board to certify the results of the election as they were on November 16, 2010—that is, before this Court ordered the Board to investigate instances of poll-worker error.

Hunter filed an emergency motion in this Court asking that it enforce the November 22 preliminary injunction and enjoin the Board from complying with Secretary Husted's directive. On January 12, 2011, the Court granted the motion in part and ordered the Board to count certain provisional ballots, namely, those which the Board's court-ordered investigation had revealed were cast in the wrong precinct due to poll-worker error.

The Board appealed the decision to the Sixth Circuit. The Sixth Circuit affirmed this Court's November 22 preliminary injunction and affirmed in part and vacated in part the January 12 order. The Sixth Circuit found that because this Court "modified the November 22, 2010 preliminary injunction by resolving disputed facts, the January 12, 2011 order should not have been issued prior to affording to defendants notice and an opportunity to be heard." *Hunter v. Hamilton Cnty. Bd. of Elections,* 635 F.3d 219, 246 (6th Cir.2011). The Sixth Circuit remanded the case so that this Court could, among other things, provide the Board with an opportunity to present evidence on the disputed issue of whether poll-worker error contributed to ballots being cast in the correct location but wrong precinct.

The Court scheduled a permanent injunction hearing to begin on July 18, 2011. The parties agreed that the hearing should be the full and final merits hearing on all issues presented in Plaintiffs' complaints. The day before the final pretrial conference and twelve days before permanent injunction hearing, the Board filed a motion for summary judgment asserting, for the first time, that it was immune from suit under the Eleventh Amendment. The Court declined to rule on the motion prior to the hearing. The Board filed an appeal, which the Sixth Circuit dismissed for lack of jurisdiction.

The permanent injunction hearing commenced on July 18, 2011 and concluded on August 5, 2011. At the conclusion of the hearing, NEOCH and the ODP moved for leave to file an amended complaint to conform their claims to the evidence. The Court granted the motion, and the Board

injunction. (Doc. 2.) The motion was not *ex parte:* the Board and intervening parties received notice of the motion and hearing, and

all participated in the hearing. Therefore, the Court treated the motion as one for a preliminary injunction. (*See* Doc. 13 at 2.)

filed a motion to dismiss the amended complaint.

The Board's motions for dismissal (Doc. 191) and for summary judgment (Doc. 94) are ripe for adjudication. As set forth below, the Court DENIES both motions. Additionally, having considered the evidence and arguments advanced by the parties regarding the merits of Plaintiffs' claims, the Court finds for the Plaintiffs on their claims that Defendants violated voters' right to equal protection under the law and violated the *NEOCH* Consent Decree. Conversely, the Court cannot at this time enter a judgment in favor of Plaintiffs on their claim that Defendants violated voters' right to due process of law.

## II. RESOLUTION OF PENDING MOTIONS

The Court will first address the Board's motion for summary judgment and motion to dismiss NEOCH and ODP's first amended complaint.

### A. The Board's Motion for Summary Judgment

#### 1. The Board is not immune from suit

The Board moves for summary judgment on the ground that, as an arm of the State of Ohio, it is entitled to sovereign immunity under the Eleventh Amendment. Hunter raises three arguments in opposition. First, Hunter argues that the Board is not an arm of the State and, thus, is not entitled to Eleventh Amendment immunity. Second, Hunter argues that even if the Board is entitled to Eleventh Amendment immunity, the Board has waived that immunity by its own conduct in this litigation. Finally, Hunter argues that even if the Board has not waived Eleventh Amendment immunity, the present suit could still proceed against the individual board members under the *Ex parte Young*

doctrine. The Court will briefly address each argument in turn.

█ First, the Court finds that the Board functions as an arm of the State with respect to its review and counting of provisional ballots. The Board is created by statute. Ohio Rev. Code ("O.R.C.") § 3501.05. Its membership is appointed by the Ohio Secretary of State. O.R.C. § 3501.05(A). The Board is vested with broad powers to manage the conduct of elections on behalf of the State and does so under the guidance of the Secretary of State. *See* O.R.C. § 3501.11. Consequently, with respect to its review and counting of provisional ballots, the Board functions as an arm of the State and is entitled to Eleventh Amendment immunity.

As Hunter contends, however, the defense of Eleventh Amendment immunity may be waived by consent in three ways: "[A] State may waive Eleventh Amendment immunity through its own conduct: by legislation, *Port Auth. Trans–Hudson Corp. v. Feeney,* 495 U.S. 299, 305, 110 S.Ct. 1868, 109 L.Ed.2d 264 (1990); by removing an action to federal court, *Lapides v. Bd. of Regents of the Univ. Sys. of Ga.,* 535 U.S. 613, 616, 122 S.Ct. 1640, 152 L.Ed.2d 806 (2002); or by "appearing without objection and defending on the merits," *Ku v. Tennessee,* 322 F.3d 431, 435 (6th Cir.2003). *Nair v. Oakland Cnty. Cmty. Mental Health Auth.,* 443 F.3d 469, 474 (6th Cir. 2006). In *Ku v. Tennessee,* waiver took the form of defense on the merits in federal court. In that case, the State of Tennessee appeared involuntarily as a defendant, engaged in substantial discovery, and filed a motion for summary judgment. *Id.* at 432. Only after receiving an adverse ruling on its motion for summary judgment did the State raise the defense of Eleventh Amendment immunity, "reveal[ing] that it had its fingers crossed

behind its metaphorical back the whole time." *Id.* at 435. The Sixth Circuit determined that the State's conduct constituted a form of voluntary invocation of federal jurisdiction that was sufficient to waive the Eleventh Amendment immunity defense. *Id.*

■ Here, the Board was initially brought in involuntarily as a defendant. Instead of asserting its Eleventh Amendment immunity defense,[3] the Board defended the suit on the merits, participating in extensive pre-trial activities before this Court and the Sixth Circuit. In fact, the Board raised the defense for the first time in its motion for summary judgment, which was filed just two weeks before the permanent injunction hearing. Before asserting its Eleventh Amendment Immunity defense, the Board:

- filed notices of appearance (Docs. 4–7);
- filed an opposition to Hunter's Motion for Temporary Restraining Order (Doc. 9);
- participated in the November 22, 2010 hearing on Hunter's Motion for Temporary Restraining Order;
- participated in William's appeal of this Court's November 22, 2010 Order;
- filed an opposition to Hunter's Motion to Enforce Preliminary Injunction Order (Doc. 26);
- participated in the December 13, 2010 hearing on Hunter's Motion to Enforce Preliminary Injunction Order;
- appealed this Court's January 12, 2011 Order (Doc. 48);
- participated in status conferences with the Court on January 18, 2010, January 28, 2010, and May 3, 2011;
- answered Hunter's and NEOCH's Complaints (Docs. 56 and 57);
- participated in a discovery conference with the Court on June 8, 2011;
- filed an agreed order regarding the transfer of ballots and re-use of equipment (Doc. 64);
- filed a Motion for Emergency Relief and Request for Immediate Conference regarding the transfer of ballots and re-use of equipment (Docs. 71 and 79);
- filed a Motion for Extension of Time to File Motions in Limine (Doc. 82);
- participated in the July 1, 2011 conference with the Court regarding the transfer of ballots and re-use of equipment;
- filed a trial brief (Doc. 88); and
- filed a Motion in Limine (Doc. 91).

This type of litigation conduct is inconsistent with an assertion of Eleventh Amendment immunity. Consequently, the Court concludes that the Board has waived the defense.[4]

3. The Board's Answer states only that it "intends to assert and rely upon all of the affirmative defenses, avoidances, counterclaims, cross-claims, third party claims, immunities, avoidances, and set-offs which may become available or apparent during the course of discovery or trial. Defendant Board reserves the right to amend its answer for the purpose of asserting such defenses." (Doc. 56.)

4. The Court notes that even if it did not find a waiver of Eleventh Amendment immunity, the present suit could still proceed against the individual board members under *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Defendants contend that the *Ex parte Young* exception would not apply be-

cause Plaintiffs have not alleged an ongoing violation of federal law and seek only retroactive relief. The Court disagrees. Plaintiffs allege that the individual board members engaged in conduct that violated federal law when they failed to count ballots cast in the wrong precinct for reasons attributable to poll-worker error. Plaintiffs contend that this violation is ongoing because the board members have yet to certify the results of the election. Plaintiffs seek an injunction requiring the board members to count and include in the official canvas ballots cast in the wrong precinct for reasons attributable to poll-worker error. Hunter's request for relief is properly characterized as prospective injunctive relief. Furthermore, because Hunter's re-

## 2. Plaintiffs have standing

The Board next argues that neither Hunter, NEOCH, nor ODP have standing to pursue their claims. A plaintiff seeking to invoke the jurisdiction of the federal courts "must satisfy the threshold requirement imposed by Article III of the Constitution by alleging an actual case or controversy." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). "The irreducible constitutional minimum of standing contains three requirements[:] ... injury in fact, causation, and redressability." *Nader v. Blackwell*, 545 F.3d 459, 471 (6th Cir.2008) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102–03, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998)). "[I]njury in fact [is] a harm suffered by the plaintiff that is concrete and actual or imminent, not conjectural or hypothetical." *Steel Co.*, 523 U.S. at 103, 118 S.Ct. 1003 (citation and quotation marks omitted). Causation is "a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant." *Id.* Redressability is "a likelihood that the requested relief will redress the alleged injury." *Id.*

### a. As a candidate in the November 2010 election, Hunter has standing to challenge the Board's treatment of provisional ballots

■ Defendants argue that Hunter lacks standing to challenge the Board's review and counting of provisional ballots because she, as a political candidate, has suffered no injury in fact. The Court disagrees. As this Court has previously stated, Hunter has a concrete, private interest in the outcome of this suit, as the Board's treatment of the disputed ballots matters to the outcome of the November 2010 election. At the preliminary injunction stage,

this Court found that Hunter would suffer irreparable harm if "the provisional ballots that were *not* counted were the result of 'clear poll worker error' ... and if those uncounted ballots tip the scale in [Hunter's] favor making her the winner of the race." (Doc. 13 at 8) (emphasis in original.) The Sixth Circuit agreed, noting that the "candidate who ultimately loses the election will suffer an irreparable and substantial harm." *Hunter*, 635 F.3d at 244.

Injury sufficient for irreparable harm has resonance for injury in fact under Article III. Further, Hunter's injury is traceable to the Board's allegedly unconstitutional conduct, and an order from this Court enjoining the Board from continuing to violate provisional voters' constitutional rights and compelling it to treat similarly situated ballots equally will redress the alleged injury. Accordingly, the Court finds that Hunter has satisfied Article III's standing requirements.

### b. NEOCH and ODP have standing to enforce the *NEOCH* Consent Decree

The Board next contends that NEOCH and ODP lack standing. NEOCH and ODP intervened in this suit to enforce the terms of the *NEOCH* Consent Decree. The Board argues that the Decree does not confer standing to NEOCH and ODP because it violates Article I, Section 18 of the Ohio Constitution, which provides that "[n]o power of suspending laws shall ever be exercised, except by the general assembly."

The Board's argument is as follows: Ohio law provides that a provisional ballot envelope shall not be opened and the ballot shall not be counted if the Board determines that the individual cast the ballot in the wrong precinct. O.R.C.

---

quests for declaratory relief and attorneys' fees are ancillary to her request for prospective injunctive relief, such relief also falls un-

der the *Ex parte Young* exception. *See Lawson v. Shelby County, Tenn.*, 211 F.3d 331, 335 (6th Cir.2000).

§ 3505.183(B)(4)(a)(ii).[5] The Decree suspends Ohio law because it requires the Board to open and count wrong precinct ballots in certain, narrow circumstances, including when a ballot is cast in the wrong precinct but in the correct polling place because of poll-worker error.

■ The Court disagrees with the Board's argument. The *NEOCH* Consent Decree does not suspend any Ohio law. "Suspend" is defined as: "[t]o interrupt; to cause to cease for a time; to postpone; to stay, delay or hinder; to discontinue temporarily, but with an expectation or purpose of resumption." *Black's Law Dictionary* 1446 (6th ed. 1990). The *NEOCH* Consent Decree does not stay, discontinue, permanently enjoin or declare unconstitutional any Ohio law. In fact, Ohio provisional ballot laws remain in full force. The Decree merely creates a narrow exception to provisional ballot laws, specifying that boards of elections may not reject a provisional ballot cast by a voter who uses only the last four digits of his or her Social Security number as identification if the voter cast a provisional ballot in the correct polling place, but—for reasons attributable to poll-worker error—in the wrong precinct.[6] Such an exception cannot be termed a suspension of Ohio provisional ballot laws and, consequently, the *NEOCH*

Consent Decree does not run afoul of Article I, Section 18 of the Ohio Constitution.[7] NEOCH and ODP are parties in the *NEOCH* case and are parties to the *NEOCH* Consent Decree. Because the Court finds that the Consent Decree is valid, NEOCH and ODP have standing to pursue the claims asserted. For the foregoing reasons, the Court **DENIES** the Board's Motion for Summary Judgment.

**B. The Board's Motion to Dismiss the Amended Complaint of NEOCH and ODP**

**1. NEOCH and ODP have standing to enforce the *NEOCH* Consent Decree**

The Board moves to dismiss the Amended Complaint on the basis that NEOCH and ODP lack standing to enforce the *NEOCH* Consent Decree. As the Court rejected this argument above, further discussion is not warranted here.

**2. Rule 12(b)(7) does not require dismissal of NEOCH's Amended Complaint**

The Board next argues that the Amended Complaint must be dismissed for failure to join a party under Federal Rule of Civil Procedure 12(b)(7). The Board contends that the State of Ohio is a necessary party

---

**5.** *See also* O.R.C. §§ 3505.183(B)(3)(b) (requiring, in the converse, that the Board open and count the ballot if the individual is eligible "to cast a ballot in the precinct and for the election in which the individual cast the provisional ballot"; 3503.01(A) ("Every citizen ... may vote at all elections in the precinct in which the citizen resides."); 3599.12(A)(1) ("No person shall ... vote ... in a precinct in which that person is not a legally qualified elector.").

**6.** In fact, in the *NEOCH* case, the Secretary of State and State of Ohio have taken the position that the Decree does not change Ohio law at all but rather "simply restates Ohio law." (Case No. 2:06–cv–896, Doc. 219.)

**7.** Alternatively, even if the Court were to find that the *NEOCH* Consent Decree suspends Ohio law, the decree still would not conflict with Article I, Section 18 of the Ohio Constitution because the General Assembly was represented by the Attorney General of Ohio in the *NEOCH* case. The Sixth Circuit specifically allowed the Attorney General to intervene on behalf of the State of Ohio and the General Assembly, noting that the "Attorney General is 'the chief law officer for the state and all its departments.'" (Case No. 2:06–cv–896, Doc. 53) (quoting Ohio Rev.Code Ann. § 109.02.)

under Federal Rule of Civil Procedure 19(a) because Plaintiffs have asserted due-process challenges to the Ohio election laws. The Board argues that Plaintiffs cannot proceed to challenge Ohio election laws without providing notice to the State of Ohio and without the State of Ohio's participation in this suit.

As will be discussed later in this Order, the Court will not rule upon Plaintiffs' due-process challenges to Ohio election laws because Plaintiffs have failed to comply with the requirements of Federal Rule of Civil Procedure 5.1. It is unnecessary, therefore, to determine whether the State of Ohio is a necessary party under Federal Rule of Civil Procedure 19(a).

### 3. NEOCH and ODP have stated a claim upon which relief may be granted

The Board also moves to dismiss the Amended Complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that it is entitled to sovereign immunity under the Eleventh Amendment. As the Court rejected this argument above, further discussion is not warranted here.

### 4. The Amended Complaint will not be dismissed for failure to conform to the evidence

Finally, the Board moves to dismiss the Amended Complaint on the ground that paragraphs 56 through 58 do "not conform to the evidence established at the Board's meeting on November 16, 2010 concerning voters' affirmations and names on the pro-visional ballot envelopes." (Doc. 191 at 18.) The Board contends that the evidence at trial revealed that the Board investigated for poll-worker error provisional ballots that were cast by voters who used only the last four digits of their social security numbers as identification who did not properly complete and/or sign their provisional ballot applications. Any claim to the contrary, the Board argues, does not conform to the evidence at trial and requires dismissal of the Amended Complaint. As will be discussed at length later in this order, the Court disagrees. For the foregoing reasons, the Court **DENIES** the Board's Motion to Dismiss Amended Complaint.

The Court now sets forth its findings of fact and conclusions of law regarding the merits of the claims raised in Hunter's Complaint for Declaratory and Injunctive Relief (Doc. 1) and NEOCH and the ODP's Amended Complaint (Doc. 180).

## III. FINDINGS OF FACT [8]

### A. Ohio Election Law

The Court herewith provides an overview of Ohio election law with an emphasis on the key subject in this case—provisional voting.

### 1. Statutory Framework

Election procedure in Ohio is governed by Ohio Revised Code Title 35. Unless otherwise noted, the statutory references contained herein are to the Ohio Revised Code sections in effect in November 2010.[9]

---

**8.** The permanent injunction hearing in this matter spanned twelve non-consecutive days. The hearing transcript is paginated to reflect, first, the day of the hearing and second, the page number of the transcript of testimony on that date. For example, Hr'g Tr. 4–123 is page 123 of the fourth day of trial. All exhibits referenced in this Order are exhibits admitted into evidence during the permanent injunction hearing.

**9.** Several months after this lawsuit was filed, in June 2011, the Ohio General Assembly passed House Bill 194 which substantially amended the provisional voting laws that are at the heart of this case. Among other things, the bill eliminates the requirement that poll workers direct voters to the correct precinct. Those amendments have not yet taken effect because of a pending referendum on HB 194. The matter will be submitted to voters in the

### a. Secretary of State

The Ohio Secretary of State is the state's chief elections officer. The Secretary of State oversees the elections process and appoints the members of boards of elections in each of Ohio's eighty-eight counties. O.R.C. § 3501.05(A). The Secretary of State's election-related duties include "[i]ssu[ing] instructions by directives and advisories ... to members of the boards as to the proper methods of conducting elections;" "[p]repar[ing] rules and instructions for the conduct of elections;" and "[c]ompel[ling] the observance by election officers in the several counties of the requirements of the election laws." O.R.C. § 3501.05(B), (C), and (M).

### b. Boards of Elections

The Secretary of State appoints four board members to each county's board of elections: two Republicans and two Democrats. O.R.C. § 3501.06. The board of elections is responsible for establishing election precincts, receiving and canvassing the returns of elections, and maintaining voter registration records. *Id.* In addition to its other duties, the board of elections is required to "[i]nvestigate irregularities, nonperformance of duties, or violations of Title [35] of the Revised Code by election officers and other persons." O.R.C. § 3501.11(J). The board must perform "duties as prescribed by law or the rules, directives, or advisories of the secre-

tary of state." O.R.C. § 3501.11(P). The board exercises its powers by a majority vote, with the Secretary of State acting as a tie-breaker when necessary. O.R.C. § 3501.11(X).

### c. Election Precincts

Ohio has a precinct-based voting system.[10] A "precinct" is an intra-county district established by the board of elections. All residents of a precinct must vote at a specific designated location. O.R.C. § 3501.01(Q). Pursuant to Ohio statute, a qualified elector "may vote at all elections in the precinct in which the citizen resides." O.R.C. § 3503.01(A).

A "polling place" is the place provided for each precinct at which qualified voters residing in the precinct may vote. O.R.C. § 3501.01(R). On election day, a single polling place may be designated as the polling place for residents of multiple different precincts. A voter also, in certain circumstances, may cast a ballot at the office of the board of elections. O.R.C. § 3503.16(B)(2)(c). In that case, the voter appears at the board office and board staff provides the voter with the ballot associated with his or her precinct. Any qualified elector in Ohio may apply for an absent voter's ballot and vote absentee at an election. O.R.C. §§ 3509.02, 3509.03.

---

2012 general election and HB 194 will become effective only if voters do not repeal it.

10. In 2004, the Sixth Circuit Court of Appeals made the following observations about the precinct system:

> One aspect common to elections in almost every state is that voters are required to vote in a particular precinct. Indeed, in at least 27 of the states using a precinct voting system, including Ohio, a voter's ballot will only be counted as a valid ballot if it is cast in the correct precinct.
> The advantages of the precinct system are significant and numerous: it caps the num-

ber of voters attempting to vote in the same place on election day; it allows each precinct ballot to list all of the votes a citizen may cast for all pertinent federal, state, and local elections, referenda, initiatives, and levies; it allows each precinct ballot to list only those votes a citizen may cast, making ballots less confusing; it makes it easier for election officials to monitor votes and prevent election fraud; and it generally puts polling places in closer proximity to voter residences.

*Sandusky Cnty. Democratic Party v. Blackwell,* 387 F.3d 565, 568–69 (6th Cir.2004).

#### d. Poll Workers

Each year in September, boards of elections must appoint four poll workers to work in each election precinct. O.R.C. § 3501.22.[11] The poll workers must reside in the county in which the precinct is located. *Id.* Half the poll workers in any given precinct are of the Republican Party, and half are of the Democratic Party. O.R.C. § 3501.22. Poll workers are responsible for receiving ballots and supplies, opening and closing the polls, and overseeing the casting of ballots during the time the polls are open. *Id.*

Boards of elections must designate one poll worker in each precinct to serve as a "presiding judge." O.R.C. § 3501.22. The presiding judge is the manager and team leader of the precinct; he or she must deliver the returns of the election and all supplies to the board of elections office following the election.

All poll workers in Ohio are required to complete an instruction program, established by the board of elections as prescribed by the Secretary of State, that instructs them in the rules, procedures, and law relating to elections. O.R.C. § 3501.27. Boards of elections must use training materials prepared by the Secretary of State and may use additional materials prepared by or on behalf of the board. *Id.* Ohio law requires boards of elections to instruct each new poll worker prior to his or her participation in the first election, and then reinstruct him or her at least once every three years thereafter. O.R.C. § 3501.27.

#### e. Regular Voting

To be qualified to vote in Ohio, a person must be at least eighteen years old, have resided in Ohio at least thirty days preceding the election, be a resident of the county and precinct in which the person offers to vote, and be registered to vote. O.R.C.

§ 3503.01. The names and current addresses of all registered voters within a precinct and known to the county board of elections at least thirty days before an election are contained within that precinct's "signature pollbook."

On election day, a voter whose name and current address are in the precinct's signature pollbook and who produces acceptable identification is permitted to vote a regular ballot. O.R.C. § 3505.18. Acceptable identification for this purpose is "a current and valid photo identification, a military identification, or a copy of a current utility bill, bank statement, government check, paycheck, or other government document . . . that shows the name and current address of the elector." *Id.* Ohio uses paper ballots that include boxes to the left of the candidate or issue that the voter must fill in using a pen with black or blue ink. After completing the ballot, the regular voter places the paper ballot into an optical scanning machine called the "eScan" that scans and counts the ballot.

#### f. Provisional Voting

Ohio law permits an individual whose name does not appear on the precinct's signature pollbook or who does not have one of the above-mentioned forms of identification to cast a provisional ballot under certain circumstances. O.R.C. § 3505.181. For example, an individual may cast a provisional ballot if he or she (1) declares that he or she is a registered voter in the jurisdiction and is eligible to vote, but his or her name is not in the signature pollbook; (2) provides the last four digits of his or her social security number as a form of identification; (3) has been marked in the signature pollbook as having requested an absent voter's ballot; or (4) has had his registration notification card returned to the board of elections as undeliverable. O.R.C. §§ 3505.181(A)(1), (2), (5), (6).

---

**11.** The Revised Code uses the term "precinct election judges" to refer to poll workers.

■ Under Ohio law, "only ballots cast in the correct precinct will be counted." *Sandusky Cnty. Democratic Party v. Blackwell*, 387 F.3d 565 (6th Cir.2004). As stated by the Ohio Supreme Court,

> The plain language of several statutes so provides. *See* R.C. 3503.01(A) (every qualified elector "may vote at all elections in the precinct in which the citizen resides"); R.C. 3505.181(C)(2)(a) (providing that "if an individual refuses to travel to the polling place for the correct jurisdiction ... [a] provisional ballot cast by that individual shall not be opened or counted" if the "individual is not properly registered in that jurisdiction") and (E)(1) (defining "jurisdiction" for purposes of provisional-ballot provisions as "the precinct in which a person is a legally qualified elector"); R.C. 3505.182 (requiring each individual casting a provisional ballot to execute a written affirmation stating that he or she "understand[s] that ... if the board of elections determines that" the individual is not a resident of the precinct in which the ballot was cast, the provisional ballot will not be counted); R.C. 3505.183(B)(4)(a)(ii) (if board determines that the "individual named on the affirmation is not eligible to cast a ballot in the precinct or for the election in which the individual cast the provisional ballot," "the provisional ballot envelope shall not be opened, and the ballot shall not be counted"); and R.C. 3599.12(A)(1) (prohibiting any person from voting or attempting to vote in any election "in a precinct in which that person is not a legally qualified elector") and (B) (mak-

ing a violation of that section a felony of the fourth degree).

*State ex rel. Painter v. Brunner*, 128 Ohio St.3d 17, 27–28, 941 N.E.2d 782 (Ohio 2011).

However, Ohio law also tasks the poll worker with determining whether an individual is eligible to vote in the jurisdiction by reviewing the precinct voting location guide [12] using the residential street address provided by the individual. O.R.C. § 3505.181(C)(1). If the voter is in the wrong precinct, the poll worker is to "direct the individual to the polling place for the jurisdiction in which the individual appears to be eligible to vote, explain that the individual may cast a provisional ballot at the current location but the ballot will not be counted if it is cast in the wrong precinct, and provide the telephone number of the board of elections in case the individual has additional questions." *Id.* Therefore, so long as a voter gives the poll worker his or her correct address and the poll worker complies with state law, a voter cannot cast a provisional ballot in the wrong precinct without knowing that he is casting it in the wrong precinct and that, consequently, the ballot will not be counted.

Regardless whether an individual votes regularly or provisionally, the paper ballot provided to all individuals residing in a precinct is the same. However, ballots cast by provisional voters are not scanned and counted like regular ballots on election day. Rather, the eligibility of the provisional voter—and thus that voter's ballot— must be determined by the county's board of elections. For this reason, a ballot cast

---

12. The "precinct voting location guide" is:

[a]n electronic or paper record that lists the correct jurisdiction and polling place for either each specific residential street address in the county or the range of residential street addresses located in each neighborhood block in the county [or a]ny other

method that a board of elections creates that allows a precinct election official or any elector who is at a polling place in that county to determine the correct jurisdiction and polling place of any qualified elector who resides in the county.

O.R.C. § 3505.181(E)(2).

by a provisional voter is not placed into the eScan on election day like a regular voter's ballot. Rather, a provisional voter's ballot is sealed in a special "Provisional Ballot Affirmation Envelope" and placed in a slot on the side of the eScan.

State law requires that provisional ballot affirmation envelopes include an affirmation statement that reads,

> I, _____ [print name of voter], solemnly swear or affirm that I am a citizen of the United States, I will be at least 18 years of age at the time of the general election, I have lived in this state for 30 days immediately preceding this election, I am a registered voter in the precinct in which I am voting this provisional ballot and that I am eligible to vote in the election in which I am voting this provisional ballot.
>
> I understand that, if the above-provided information is not fully completed and correct, if the Board of Elections determines that I am not registered to vote, a resident of this precinct, or eligible to vote in this election, or if the Board of Elections determines that I have already voted in this election, my provisional ballot will not be counted. I further understand that knowingly providing false information is a violation of federal law and subjects me to possible criminal prosecution.
>
> I hereby declare, under penalty of election falsification, that the above statements are true and correct to the best of my knowledge and belief.

O.R.C. § 3505.182. The provisional voter is to sign his or her name below this affirmation statement.

After the election, the provisional ballot envelopes (with completed ballots sealed inside) are taken to the board of elections where board staff review the information on the envelope and, based on that infor-

mation, determine whether the provisional ballot is eligible to be counted. O.R.C. § 3505.183. Pursuant to that statute, "[t]o determine whether a provisional ballot is valid and entitled to be counted, the board shall examine its records and determine whether the individual who cast the provisional ballot is registered and eligible to vote in the applicable election." *Id.*

If the individual is properly registered to vote, is eligible to cast a ballot in the precinct and for the election in which the individual cast the provisional ballot, and signed the affirmation statement indicating that he or she was eligible to vote, then the board shall open the provisional ballot envelope and place the ballot in a ballot box for counting. O.R.C. § 3505.183(B)(3). On the other hand, the board will not open the provisional ballot envelope or count the ballot if, among other things, the individual is not qualified or is not properly registered to vote, or the individual is not eligible to cast a ballot in the precinct or for the election in which the individual cast the provisional ballot. O.R.C. § 3505.183(B)(4)(a).

### 2. *Northeast Ohio Coalition for the Homeless ("NEOCH") Consent Decree*

The general prohibition against counting a ballot cast in the wrong precinct is not absolute. The Ohio Secretary of State and the Ohio Attorney General are parties to a consent decree (hereinafter "*NEOCH* Consent Decree" or "Decree") that specifies that, under certain limited circumstances, provisional ballots that are flawed because of poll-worker error cannot be rejected. *Northeast Ohio Coalition for the Homeless [NEOCH] v. Brunner,* Case No. 2:06cv896 (S.D.Ohio), Doc. 210.[13]

The Decree addressed the plaintiffs' concern that Ohio's provisional ballot laws

---

**13.** NEOCH and three other plaintiffs filed the lawsuit in October 2006 against the Ohio Sec-

retary of State alleging, among other things,

would be applied differently and unequally by Ohio's eighty-eight boards of elections by setting forth rules regarding the casting and counting of provisional ballots for persons without identification other than a social security number. Relevant to this case, the Decree prohibited the rejection of certain provisional ballots, stating:

> Boards of elections may not reject a provisional ballot cast by a voter, who uses only the last four digits of his or her social security number as identification, for any of the following reasons:
>
> . . . .
>
> v. The voter cast his or her provisional ballot in the wrong precinct, but in the correct polling place, for reasons attributable to poll worker error; [or]
>
> vi. The voter did not complete or properly complete and/or sign the provisional ballot application for reasons attributable to poll worker error[.]

*Id.* at 4; also PX 2008 at 4.[14] These rules were crafted to meet one of the Decree's purposes, namely, "to ensure that ... [t]hese voters will not be deprived of their fundamental right to vote because of failures by poll workers to follow Ohio law. For purposes of this Decree poll worker error will not be presumed, but must be demonstrated through evidence." (Decree I(1)(e), found at PX 2008 at 2.)

According to the Ohio Attorney General, the Consent Decree "simply restates Ohio law in Ohio Rev.Code sections 3505.18, 3505.181, and 3505.182" and "parrots the existing requirements of state law."

*NEOCH,* Case No. 2:10cv896, Doc. 219 at 18.

### 3. Ohio Secretary of State Directives

In April 2010, after the U.S. District Court entered the *NEOCH* Consent Decree, the Ohio Secretary of State issued Directive 2010–48 to all boards of elections describing and explaining the provisional ballot rules outlined in the Decree. Directive 2010–48 noted that, for individuals voting a provisional ballot using the last four digits of his/her social security number, the Decree prohibited depriving those individuals "of the fundamental right to vote because of failure of a poll worker to follow Ohio law." Like the Decree, Directive 2010–48 noted that poll-worker error would not be presumed but had to be demonstrated through evidence.

The day before the 2010 general election, on November 1, 2010, the Secretary of State issued two more directives pertaining to provisional ballots. Directive 2010–73 (DX 1019) reiterated the terms of the *NEOCH* Consent Decree and instructed the boards of elections to comply with it. Directive 2010–74 (JX 34) provided guidelines for the boards of elections in processing and counting provisional ballots and expressly noted that the guidelines included relevant rulings in the *NEOCH v. Brunner* lawsuit.

In Directive 2010–74, the Secretary of State set forth the steps that boards of elections and/or board staff were required to take when determining the eligibility of provisional ballots.[15] Each of these steps

---

14. The "provisional ballot application" is the front of the provisional ballot envelope and includes the affirmation statement discussed in section III(A)(1)(f) of this order.

that Ohio's provisional ballot laws would be applied differently and unequally by Ohio's eighty-eight boards of elections. The Ohio Attorney General moved to intervene in the action on behalf of the State in order to defend the constitutionality of the challenged statutes. *NEOCH,* 2:06–cv–896, Doc. 22. The trial court denied the State's motion to intervene, but the Sixth Circuit reversed and granted the State's motion. *Id.,* Doc. 53 at 8.

15. In recognition of the fact that the four board members themselves could not possibly personally review each provisional ballot envelope, the Directive specified that boards were permitted to delegate the processing and

correlated to, and cited, a particular subsection of O.R.C. § 3505.183. Relevant to this case, Step 2 of the Directive provided a series of steps for the staff to use to determine whether the provisional ballot was eligible for counting, including determining (1) whether the person who cast the provisional ballot was registered to vote, (2) whether the person was eligible to vote in the particular election in question, and (3) whether the person completed the affirmation on the provisional ballot envelope. (*Id.* at 5.) Regarding the second of these steps—a person's eligibility—the directive noted that if the person was either not registered to vote or was not eligible to vote in the particular election, "(e.g., if the vote is cast in the wrong precinct)," then the ballot was not to be counted. (JX 34 at 5–6.) However, a footnote clarified that a board *could not reject* a provisional ballot cast by a voter who used only the last four digits of his or her social security number as identification when the ballot was cast in the wrong precinct but the correct multi-precinct polling location for reasons attributable to poll-worker error. (JX 34 at 6 n. 2 (*citing NEOCH*, S.D.Ohio No. 2:06–cv–896)). Step 3 directed board staff to consider any additional information provided by the person who cast the provisional ballot. The Step 3 instruction again reminded board staff that a provisional ballot cast by a voter who used only the last four digits of his or her social security number as identification could not be rejected for reasons attributable to poll-worker error. (*Id.* at 7.)[16]

The Secretary of State explained the concept of "poll worker error" more fully in Section VII of Directive 2010–74. That section specified that boards of elections in Ohio could not reject a provisional ballot cast by a voter who used only the last four digits of his or her social security number as identification when, among other things, (1) the voter cast his or her provisional ballot in the wrong precinct, but in the correct polling place, for reasons attributable to poll-worker error or (2) the voter did not complete or properly complete and/or sign the provisional ballot application for reasons attributable to poll-worker error. (*Id.* at 11.) The directive specifically described three types of poll-worker error:

A. One example of the type of poll worker error contemplated under the *NEOCH* consent decree occurs when a voter fails to sign the provisional ballot affirmation statement portion of SOS Form 12–B [the provisional ballot envelope], but the poll worker completes and signs the verification statement portion of ... [the provisional ballot envelope] indicating that the voter **has** completed the affirmation and without indicating that the voter declined to complete the affirmation. If this occurs, the board of elections should, either in writing, with written response from the poll worker, or at a public meeting of the board, question the poll workers in that precinct to determine whether they followed the board's instructions for completing the verification statement, both as to the specific ballot in question and

some aspects of the counting of provisional ballots to board staff, so long as such processing was done in bipartisan teams. (JX 34 at 2.)

16. Subsection iii of Step 3 states:
 In determining the eligibility of a provisional ballot cast by a voter who uses only the last four digits of his or her Social Security

number as identification, the board staff must attempt to determine whether a potentially disqualifying flaw in the ballot is attributable to poll worker error. An otherwise qualifying provisional ballot may not be rejected for reasons that are attributable to poll worker error. Please see Section VII, below, for more information. (JX 34 at 7.)

in general on Election Day. Where a poll worker's response indicates that he or she did not properly complete the verification statement, that response and the completed poll worker verification statement provide objective evidence that the poll worker did not ensure that the voter had completed the affirmation before the poll worker filled out the verification statement portion of . . . [the provisional ballot envelope].

**B.** Another example of poll worker error is where the provisional ballot affirmation envelope . . . contains notations indicating that a poll worker directed the voter to the wrong precinct at a polling location containing multiple precincts. Because it is a poll worker's duty to ensure that the voter is directed to the correct precinct, these notations provide objective evidence that the poll worker did not properly or to the fullest extent required carry out his or her Election Day duties. Similarly, if a board of elections finds multiple provisional ballots voted in the correct polling location but wrong precinct, it should, either in writing, with written responses from the poll workers, ·or at a public meeting of the board, question the poll workers in that polling location to determine whether they followed the board's instructions for ensuring that voters were directed to the correct precinct.

**C.** Failure of a poll worker to complete and sign the "Election Official Verification Statement" portion of . . . [the provisional ballot envelope] is clear evidence of poll worker error because election officials are required by R.C. 3505.182 to complete this information.

(*Id.* at 11–12) (emphasis in original.) The Secretary of State transmitted this directive to all county boards of elections the day before Election Day.

## B. Hamilton County Board of Elections and the 2010 General Election

Having described Ohio election law as it was in November 2010, the Court now turns to the persons and events that are at the crux of the case: the Hamilton County Board of Elections and its staff, the poll workers and their training, Election Day, and the meetings at which Board members decided which provisional ballots to count.

### 1. The Board

The Hamilton County Board of Elections is headed by board members Alex Triantafilou (R), Charles Gerhard, III(R), Timothy Burke (D), and Caleb Faux (D). The Board employs a director, deputy director, four administrators, and a staff of approximately forty-two people, half of whom are Democrats and half of whom are Republicans. (Hr'g Tr. (Krisel) 1–33.) Sally Krisel is the director of the Hamilton County Board of Elections. As director, Krisel's duty is to oversee all aspects of elections in Hamilton County. (Hr'g Tr. (Krisel) 1–31.) Sherry Poland is one of four administrators employed at the Board of Elections. (Hr'g Tr. (Krisel) 1–34.) Poland is in charge of operations, which includes the registration department as well as provisional and absentee voting. (Hr'g Tr. (Krisel) 1–34.)

As part of its service to Hamilton County residents, approximately sixty days before an election, the Board sends an "Election Day Notice" to all registered voters in Hamilton County at the address on file with the Board. (Hr'g Tr. (Goldsmith) 10–23 to 10–24; DX 1003.) The Notice is "return service requested" and thus is not forwarded by the post office. The Notice includes the voter's precinct and the voter's polling location, but it does not indicate where the voter's precinct will be at that polling location. (Hr'g Tr. (Burke) 2–86.) The Board also maintains a web page

where voters can check to see if they are registered to vote and learn the polling location and precinct at which they are to vote. (DX 1002.)

## 2. Poll Workers

Anyone registered to vote in Hamilton County may sign up to be a poll worker. Poll workers need not have a high-school diploma or GED, nor are they required to demonstrate any particular level of literacy. (Hr'g Tr. (Krisel) 12–61.)

The Board appoints both a presiding judge and a deputy judge to each precinct. (Hr'g Tr. (Krisel) 1–43.) The deputy judge, who is of the opposite political party to that of the precinct's presiding judge, acts as an assistant to the precinct's presiding judge during an election. In addition to the four poll workers per precinct required by Ohio law, the Board assigns two more poll workers to any precinct that has more than 900 voters. (Hr'g Tr. (Krisel) 12–20.) Accordingly, each Hamilton County precinct has either four or six poll workers, one of whom is the presiding judge and another of whom is the deputy presiding judge.

In each precinct, the presiding judge is to assign one of the poll workers to act as the "provisional judge." (Hr'g Tr. (Krisel) 1–43 to 1–44; JX 6 at 4.) The provisional judge is responsible for processing provisional ballots at the precinct and has specific duties unique to that task. (Id.)

In polling locations where there are four or more precincts reporting, the Hamilton County Board of Elections also hires a "precinct guide." In the November 2010 election, Hamilton County had sixteen voting locations with four or more precincts reporting and to which the Board assigned a precinct guide. (Hr'g Tr. (Krisel) 1–32.) In all, the Board of Elections retained more than 3000 poll workers for the November 2010 general election.

## 3. Poll Worker Training

In Hamilton County, board of elections staff members do not train poll workers. Rather, the Board recruits individuals in the community, predominately retired school teachers, to conduct the poll worker training sessions. (Hr'g Tr. (Krisel) 12–20.) These trainers go through a seven- to ten-day training course depending on the election. (Id.)

For the November 2010 election, these poll worker trainers conducted 190 poll worker training classes at nine different locations in Hamilton County. (Hr'g Tr. (Krisel) 12–21.) Each class lasted for three hours. (Id.) Although state law requires that presiding judges be reinstructed only every two years, the Hamilton County Board of Elections trains its presiding judges and deputy presiding judges more frequently, training them for each county-wide election. (Hr'g Tr. (Krisel) 1–62.) Poll workers are paid for attending the training session. (Hr'g Tr. (Krisel) 12–21.)

The Hamilton County Board of Elections updated its poll worker training program prior to the November 2010 election. The updated training program included PowerPoint slides and videos designed to facilitate the poll worker training. The updated training materials also included two printed books: the Poll Worker Comprehensive Manual (JX 6) and the Poll Worker Quick Guide (JX 7). Both the Comprehensive Manual and the Quick Guide, which is a condensed version of the Comprehensive Manual, explained all the duties and tasks the poll workers were to undertake on election day. During poll worker training, trainers refer to and rely on the Quick Guide. Every poll worker receives his or her own copy of the Quick Guide, either at the training or in the mail. (Hr'g Tr. (Krisel) 1–39 to 1–40.) A copy of the larger Comprehensive Manual is deliv-

ered to each precinct on election day for the poll workers to use as an additional reference tool. (*Id.*)

The Quick Guide included specific instructions pertaining to each step of the voting process, including a diagram of the "check-in table" that showed the poll workers where they were to sit on election day and listed what materials they were to have. (JX 7 at 12, excerpted below.)

# Review Check-In Table

On election day, the voter is supposed to start with the first poll worker and then work his or her way down the table, depending on the instructions of the poll worker. The first poll worker, "Judge 1," checks to see if the voter's name is in the signature pollbook. (*Id.*) The second poll worker, "Judge 2," gives the paper ballots to the voters. (*Id.*) The third poll worker, "Judge 3," is responsible for the provisional voting materials and voter address look-up. (*Id.*) The presiding judge sits at the end of the table where he or she can assist voters, monitor the precinct, and help other judges. (*Id.*) In large precincts that are assigned six poll workers rather than four,

"Judge 5" assists Judge 3 with the provisional materials and "Judge 6" assists the presiding judge.

The Quick Guide section titled "Guidelines for Processing Voters" begins with the following information:

A voter must vote in the precinct where he/she lives in order for their ballot to count. Is the voter's name and current address in the Signature Poll Book? If not, ask the voter to go to the Provisional Judge who will locate the correct precinct using the Street Lists. See Provisional Voting Section in this manual. See also ***Comprehensive Manual.***

**Please call 632–7000 to determine the voter's correct precinct location.**

(JX 7 at 13 (emphasis in original).) The Quick Guide "Guidelines for Processing Voters" (JX 7 at 13) and "Processing the Provisional Voter" (JX 7 at 22) sections specify that the Provisional Judge is to locate the voter's correct precinct using the street lists.

To summarize, the poll worker acting as Judge 1 must decide whether the individual presenting at the table is entitled to cast a regular ballot or whether the individual should be directed to the provisional judge. If the individual's name and current address are correctly listed in the signature pollbook and he or she presents acceptable and current identification, the poll worker is instructed to give the individual a regular paper ballot to mark and then place in the eScan voting machine. (JX 7 at 14.) Conversely, if the individual does not meet those criteria, the poll worker must direct that individual to the provisional judge. (JX 7 at 13.)

When Judge 1 sends a voter to the provisional judge, the first thing the provisional judge must do is verify that the individual's current address is located in the precinct. (JX 7 at 22; JX 6 at 6 (**"Provisional Judge** ... 1. Verifies voter's **current address** is in the **Precinct Street List."**) (emphasis in original).) To enable the provisional judge to do this, the Board supplies him or her with three different precinct voting location guides: a county street list that includes every street address in Hamilton County (a spiral-bound, 1½-inch thick, double-sided book with a green cover and commonly referred to as "the Green Book") (JX 9); a ward or township street list that includes only the street addresses located in the ward or township in which the precinct is located (JX 10); and a precinct street list that includes only the street addresses within a single precinct (JX 11). (Hr'g Tr. (Krisel)

1–45; *see also* JX 6 at 5.) The provisional judge should first attempt to locate the voter's address in the precinct guide to make sure the address is within the precinct in which the voter is trying to vote. (Hr'g Tr. (Krisel) 1–47.) If the individual's address is not in the precinct street list, the provisional judge is to look up the address in the other location guides to determine in which precinct that individual resides and where that person should vote. (Hr'g Tr. (Krisel) 1–47.)

If the provisional judge is able to confirm that the voter's current address is in the precinct, the provisional judge is to verify the individual's valid identification (or write in the last four digits of the individual's social security number if the individual did not bring identification) and give the individual a provisional ballot envelope. (JX 7 at 22.)

The provisional ballot envelope is a large, catalog-style envelope designed so that the paper ballot can be placed into the envelope without being folded. The provisional judge is to direct the voter to complete Steps 1 through 8 on the front of the envelope and sign at the bottom. (JX 6 at 6; JX 7 at 22.) The first seven steps guide the voter to write in his or her name, current and former address, whether the voter has changed his or her name, the voter's birth date, the reason why the voter is voting a provisional ballot, and the form of identification the voter provided to the poll worker. (JX 1.) The last step is comprised of the statutorily required affirmation statement which the voter must attest to by signing his or her name.

Below the voter's signature line is a signature line for the "witnessing election official." Under the "witnessing election official" signature line, the following text appears in bold, all capital typeface: "ID PROVIDED YES NO." The provisional judge is to sign his or name as the witness-

ing election official and check "YES" or "NO" to reflect whether the voter has provided identification. (*Id.*)

Also on the bottom of the envelope front is a block where Board staff place a label that indicates in which precinct the provisional ballot envelope was cast. (*Id.*) For example, all provisional ballot envelopes (and ballots) at the Cincinnati 25–A precinct table are labeled "Cincinnati 25–A," whereas all the provisional ballot envelopes (and ballots) at the Cincinnati 25–J precinct table are labeled "Cincinnati 25–J." These labels indicate to the Board where a provisional voter cast his or her provisional ballot. Ballots also are marked with the precinct name and number. It is assumed that if a provisional voter receives a provisional ballot envelope marked "Cincinnati 25–J" that he or she also will receive a ballot marked "Cincinnati 25–J."

Unlike the front of the provisional ballot envelope, which is to be completed by the voter, the back of the envelope is to be completed entirely by the provisional judge. The provisional judge is instructed to complete the four steps on the back of the envelope and sign the back of the envelope. In those four steps, the provisional judge is to record the voter's name, the date, whether the voter is to provide any additional information before the board of elections can determine the voter's eligibility, and what type of identifica-

tion the voter provided, if any. (JX 7 at 22–23.)

After the voter provides all the necessary information on the provisional ballot envelope, the voter is to sign and print his name and address in the yellow provisional voter signature pollbook, and the provisional judge is to give that precinct's ballot to the individual. After marking the ballot, the individual is to place the ballot in the provisional ballot envelope and place the envelope in the side slot on the eScan tub. (JX 7 at 24.) There are blank "notes" pages in the back of each precinct's provisional voter signature pollbook where poll workers can record information that might be relevant to the Board's determination of a provisional voter's eligibility to cast a ballot.

The written instructions in the Quick Guide do not tell the provisional judge what do to if the individual's current address is *not* in the precinct street list. However, the Comprehensive Manual explains that if the voter's address is not in the precinct street list, the provisional judge is to attempt to find the individual's address in the county street list and give the voter directions to the correct precinct listed next to the street name. (JX 6 at 5.) [17] Although the precinct's presiding judge is to assign one poll worker to be the precinct's provisional judge, all poll work-

---

**17.** Page 4 of the "Provisional Voting" section of the Comprehensive Manual states:

> The Provisional processing Judge must check the voter's current address in the Precinct Street List to make sure that they live in the precinct in which they are trying to vote. The Judge also checks the voter's ID. Check the street numbers in the Street List carefully as well as the street name ending in Ct., Lane, Rd., etc.
>
> If the voter's address cannot be found in the Precinct Street List look up the address in the Ward/TWP Street list. If the address is in the Ward/TWP, and the polling location is close by, give the voter directions. Check

> the numbers carefully as well as the street name ending i.e. Ct., Lane, Rd. Pay particular attention to the house numbers (odd/even range). Some streets may be divided into different precincts.
>
> If the voter's address cannot be found in the Ward/TWP Street List, look up the address in the County Street List. If the address is in a polling location close by, give the voter directions to the correct precinct listed next to the street name. If the polling location is outside the Ward/TWP please call 632–7000 to confirm.
>
> (JX 6 at 5.)

ers in Hamilton County are trained to be able to perform that function so they can "fill in" when the assigned provisional judge has to take a break. (Hr'g Tr. (Krisel) 1–43 to 1–44.)

Hamilton County poll workers are taught all of this information, and more, in a single, three-hour training session. (Hr'g Tr. (Krisel) 12–21.) Training sessions typically have a trainer-to-poll worker ratio of 1:24. During training, poll workers are asked to do four hands-on exercises designed to mimic the functions they would perform at polling places on election day, but there is no formal test to evaluate whether the poll workers can correctly process a provisional voter. (Hr'g Tr. (Krisel) 12–23.)

The Board evaluates poll workers based on information received from voters and other poll workers on election day, letters received after election day, known mistakes made by poll workers, information received from troubleshooters in the field on election day, and information received from trainers following the training classes. (Hr'g Tr. (Krisel) 12–33 to 12–38.) Based on this information, the Board may discharge poll workers. (Hr'g Tr. (Krisel) 12–34.)

### 4. The November 2010 General Election

#### a. Voting at the Board of Elections Office

Under certain circumstances, a voter may cast a ballot at the Hamilton County Board of Elections' downtown Cincinnati office located at 824 Broadway on or before Election Day. Provisional ballots cast at the Board's office account for voters who move prior to Election Day but fail to update their existing voter registration. (Hr'g Tr. (Krisel) 1–76.) [18] At the Board

office, staff have access to ballots for each of the 680 precincts located in Hamilton County. (Id. at 1–77.)

The process of voting provisionally at the Board's office is as follows. The voter first tells a Board staff member his or her new address. (Id.) The Board staff member then enters the address provided by the voter into the Board's computerized voter registration system, which is essentially an electronic version of the Green Book. (Id.) The computer processes the address entered by the staff member and indicates the precinct in which that address is located. Once the Board staff member determines the voter's precinct, the staff member fills in the "Office Use Only" box on the bottom left corner of the front of the provisional ballot envelope. (Hr'g Tr. (Poland) 7–280.) The provisional ballot envelope is pre-labeled "Board of Elections" (as opposed to a precinct such as "Cincinnati 25–J") to indicate that the voter cast a ballot at the Board's office and not at a specific voting precinct. (JX 1 at 1.) Below the "Board of Elections" sticker, the staff member records the voter's new and old precinct numbers. (Hr'g Tr. (Poland) 7–280.) The staff member then gives the voter the provisional ballot envelope and instructs the voter to fill out the eight steps on the front of the envelope. (Hr'g Tr. (Krisel) 1–77.) Afterwards, the staff member completes the back of the envelope and gives the voter a ballot for the precinct associated with the voter's current address. (Id.)

Ballots for the 680 precincts are kept in a filing system, and the staff member must select the precinct ballot associated with the voter's current address. The precinct number the staff member writes on the provisional ballot envelope should be the same as the precinct number printed on

---

18. No one testified that a voter could cast a provisional ballot at the Board office for a reason other than because the voter had changed his or her address.

the ballot the staff member hands to the voter.

### b. Voting at Polling Places on Election Day

Election day in Hamilton County was November 2, 2010. On that day, there were 680 precincts and 438 polling locations in the County. (Hr'g Tr. (Krisel) 1–73; DX 1007 at 10.) Out of those 438 polling locations, 169 locations were multiple precinct voting locations. (DX 1007 at 10.) One location had six precincts reporting—the highest number of precincts reporting to any one location in Hamilton County. (*Id.*) More than 2000 poll workers worked the precincts in Hamilton County that day.

Fifty poll workers from 47 different precincts testified at the permanent injunction hearing about their conduct and experience on Election Day. Those 50 poll workers processed 248 of the approximately 10,500 provisional ballots cast that day. Seventeen voters also testified about their experience on Election Day. This evidence showed that many problems arose with respect to provisional voting at polling locations on Election Day.

First, some voters believed that if they were in the correct location, then they were in the correct precinct. A poll worker who worked one of four precincts stationed in the same location testified that her table was closest to the door and that "whenever anyone came in [to the building], they assumed they were at the right precinct." (Hr'g Tr. (Hall–Muhammad) 4–50 to 51.) Another voter called the Board of Elections to find out where to vote and was told only a voting location, not a precinct. (Hr'g Tr. (Schlueter) 10–180.) When she arrived at the location, she approached one of two tables, and a poll worker looked up her address. (*Id.*) The poll worker told her she was at the correct precinct table, and the voter cast her ballot. (*Id.*) In fact, the voter's correct precinct table was across the room. (*Id.* at 181.)

Second and more important, the testimony revealed that some poll workers failed to recognize the significance of voting at the correct precinct table, did not understand how to process a voter whose name did not appear in the signature pollbook, and failed in their statutory duty to direct voters to their correct precinct. At the outset, the testimony revealed that many precincts did not have a single poll worker who understood that his or her role was to act as the provisional judge. Poll workers often alternated roles at the precinct table and, consequently, multiple poll workers processed provisional voters at various times. (Hr'g Tr. (Claborn) 2–153; (Moore) 2–231; (Strauss) 3–96; (Rhonda Jackson) 4–87; (Stoops) 5–70.) Perhaps consequently, the testimony indicates that many poll workers did not follow the steps for processing provisional voters as described in the Comprehensive Manual, the Quick Guide, and the relevant Directives and statutes.

As detailed earlier in this opinion, the first thing a provisional judge must do is verify that the voter's current address is located in the precinct. (JX 7 at 22; JX 6 at 6.) Many poll workers skipped this step entirely when processing provisional voters, assuming that another poll worker had already made that determination. (Hr'g Tr. (C. Hill) 3–26 to 3–27; (Rouse) 4–25 to 4–26; (Regina Jackson) 5–8–9; (Webb) 5–56; (Johnson) 6–55; (Brenner) 7–31; (Steward) 7–51; (Flannery) 7–104; (Chandler) 7–129 to 7–130; (Haynes) 8–165 to 8–166.) As a result, some voters likely were told to vote a provisional ballot in the precinct when, in fact, a poll worker's review of the voting location guide would have shown that the voter should be directed to another precinct for his or her vote to count. Of the 50 poll workers who testified at the permanent injunction hear-

ing that they processed provisional voters on Election Day, 34 said there were times when they did not look up the voter's address to confirm the voter was in the correct precinct. (Doc. 189–1 at 2–8.)

Of the poll workers who did attempt to verify that a voter's current address was within the precinct by looking up the voter's current address in a precinct voting location guide, many made mistakes and believed the voter was in the correct precinct when, in fact, he or she was not. These poll workers testified that they would have directed the voters to their proper precinct if they had known that the voter was in the wrong precinct. (Hr'g Tr. (Hall–Muhammad) 4–77; (Williams) 6–89.) Most notably, many poll workers mistakenly identified the voter's precinct in situa-

tions where the voter's street was divided into different precincts based on the house number. (Hr'g Tr. (Claborn) 2–163 to 2–167; (Strauss) 3–84 to 3–91; (Williams) 4–128 to 4–129; (Patterson) 4–152 to 4–153; (Kennedy) 9–45; (Crooms) 9–85 to 9–86.) This was because the Green Book proved to be a complicated, unwieldy, and difficult tool to use.

For example, at the hearing a poll worker was asked to look up the address for a voter residing at 2396 Boudinot Avenue—something that poll worker would have done on election day when processing this voter. (Hr'g Tr. (Claborn) 2–163.) The address 2396 Boudinot falls within two Boudinot Avenue address ranges listed in the Green Book: 2300–2896 and 2301–2899. (JX 9 at 43 (excerpted below).)

| STREET NAME | Even/ Odd/Both | LOW | | HIGH | ZIP | PRECINCT | POLLING LOCATION |
|---|---|---|---|---|---|---|---|
| BOUDINOT AVE | O | 3623 – | | 3919 | 45211 | CINCINNATI 26-C | WESTWOOD UNITED METHODIS |
| BOUDINOT AVE | B | 3920 – | | 4351 | 45211 | GREEN B | JOY COMMUNITY CHURCH I 500 |
| BOUDINOT AVE | E | 2300 – | | 2898 | 45238 | CINCINNATI 25-J | FOUR TOWERS APARTMENTS I |
| BOUDINOT AVE | O | 2301 – | | 2899 | 45238 | CINCINNATI 26-T | CENTRAL CHURCH OF CHRIST I |
| BOUDINOT AVE | E | 2900 – | | 3098 | 45238 | CINCINNATI 26-V | CENTRAL CHURCH OF CHRIST I |
| BOUDINOT AVE | O | 2901 – | | 3021 | 45238 | CINCINNATI 26-T | CENTRAL CHURCH OF CHRIST I |
| BOUDINOT AVE | O | 3023 – | | 3099 | 45238 | CINCINNATI 26-V | CENTRAL CHURCH OF CHRIST I |

To the left of the address range, in the "Even/Odd/Both" column of the Green Book, an "E" is listed before the range 2300–2896 and an "O" is listed next to 2301–2899. (JX 9 at 43.) The "Precinct" column of the Green Book indicates that voters with even address numbers ranging from 2300–2896 Boudinot were supposed to vote at precinct Cincinnati 25–J during the November 2010 election. (Id.) Voters with odd address numbers ranging from 2301–2899 Boudinot were supposed to vote at precinct Cincinnati 26–T. (Id.) As this particular poll worker's testimony made clear, some poll workers did not notice that some rows in the Green Book pertained only to even house numbers and a different row pertained to odd house numbers on the same street. (Hr'g Tr. (Claborn) 2–164) (testifying as to her belief·

that 2396 Boudinot was in precinct 26–T, which in fact was the correct precinct only for odd house numbers in that address range); see also (A. Johnson) 6–68 to 6–69 (testifying that she did not know that for some streets the even side of the street voted in a different precinct than the odd side of the street.) At least one poll worker testified that if a voter's address fell within street address ranges associated with two different precincts (regardless of the even/odd distinction), the voter could simply vote in the precinct of his or her choice. (Hr'g Tr. (P. Thompson) 9–127.)

In at least one instance, a poll worker appeared to be unable to distinguish between even and odd numbers. (Hr'g Tr. (Hampton) 2–202 to 2–205.) When asked whether the house number 798 was even or odd, the poll worker responded:

**A.** Odd.

**Q.** And why do you think that's odd? I'm sorry. Why do you think her address is an odd address?

**A.** Because it begins with an odd number.

**Q.** It starts with an odd number?

**A.** Yes. Nine is an odd number. Eight's even.

...

**Q.** ... So on Election Day, if somebody came in with an address 798 and you had two ranges to choose from, you would choose the odd for them?

**A.** Yes.

**Q.** Okay. And is that how you did it for all the ballots that you looked up on Election Day?

**A.** To determine if they were even—yes.

**Q.** To determine if they were even or odd, you looked at the first digit of the address?

**A.** No. I looked at the whole address.

**Q.** And you chose however many—if there were more odds than even numbers, it would be an odd address?

**A.** Yes.

(*Id.* at 204 to 205.)

The testimony also revealed that many poll workers failed to follow proper procedures after giving the provisional ballot envelope to the voter. Rather than directing voters to complete Steps 1 through 8 on the front of the envelope, multiple poll workers testified that they filled in much of this information for voters. (Hr'g Tr. (C. Hill) 3–16 to 3–17; (Moon) 3–146 to 3–147.) Many poll workers failed to sign as a witness on both the front and back of the envelope. (Hr'g Tr. (Singer) 2–214; (Moore) 2–233 to 2–234; (Strauss) 3–93 to –95; (Gentry) 4–166 to 4–167; (Regina Jackson) 5–13; (Gehring) 6–16.) Multiple poll workers testified that they signed as a witness to provisional ballot envelopes that they did not, in fact, witness or process.

(Hr'g Tr. (Claborn) 2–176; (Gentry) 4–168; (Yates) 8–95 to 8–96.) One poll worker testified that she signed as a witness to a provisional ballot envelope from a different precinct. (Hr'g Tr. (Yates) 8–100 to 8–101.) Another poll worker testified that her precinct ran out of pre-labeled provisional ballot envelopes, so she borrowed pre-labeled provisional ballot envelopes from a different precinct table within the same building. (Hr'g Tr. (Shivers) 8–208 to 8–212.)

The testimony revealed that many poll workers did not direct voters to the correct precinct if the voter's address did not appear in the precinct street list. (*See* Hr'g Tr. (Moore) 2–131; (Lynem) 3–129; (Moon) 3–170; (Regina Jackson) 5–12; (Crooms) 9–81; (Byrd) 9–174.) Some poll workers instructed voters to check in with other precinct tables at multiple precinct locations rather than providing voters with their correct precinct. (Hr'g Tr. (Claborn) 2–167 to 2–173; (Williams) 3–56 to 3–57; (Rankin–Moon) 3–141.) One poll worker testified that he did not attempt to determine the voter's correct precinct; rather, he would simply allow the voter to cast a provisional ballot, even if that voter's correct precinct was in the same voting location. (Hr'g Tr. (Lynem) 3–128 to 3–129.) Another poll worker, a presiding judge, testified that he let anyone vote at his precinct, even if he knew that the voter resided in another precinct. (Hr'g Tr. (Moore) 2–231) ("I have a rule .... let's say a person walks in and then we'll look and then they'll say, well, they're not supposed to be here, I figure if they made enough effort to vote, I am going to let them vote and I am going to just make it provisional.")

The testimony revealed that many poll workers failed to warn voters that a ballot would not be counted if cast in the wrong precinct. (Hr'g Tr. (Moore) 2–232; (Ly-

nem) 3–130 to 3–131; (Williams) 3–46; (Strauss) 3–91; (Moon) 3–170; (Rouse) 4–15 to 4–16; (Hall–Muhammad) 4–78; (Regina Jackson) 5–12; (Crooms) 9–81; (Paulette Thompson) 9–131.) Some poll workers failed to do so because they simply didn't realize that voters were casting ballots in the wrong precinct on Election Day. (Hr'g Tr. (Williams) 3–46; (Rouse) 4–15–16; (Hall–Muhammad) 4–78.) Other poll workers testified that they did not warn voters because they were not aware that ballots cast in the wrong precinct would not be counted. (Hr'g Tr. (Moore) 2–232; (Strauss) 3–91.) Many poll workers mistakenly informed provisional voters that they could correct problems in the provisional voting process, such as casting a ballot in the wrong precinct, by contacting the Board of Elections. (Hr'g Tr. (Rouse) 4–36); (Lynem) 3–131; (Paulette Thompson) 9–130; (Lovette) 9–245.

The testimony revealed that some poll workers simply ignored the procedures for provisional voting. One poll worker, a presiding judge, testified that he did not try to learn the procedures outlined in the Comprehensive Manual, that he did not consult either the Comprehensive Manual or the Quick Guide on Election Day, and that he was unaware that he had any responsibility to ensure that the other poll workers at his precinct complied with the outlined procedures on Election Day. (Hr'g Tr. (Singer) 2–213 to 2–219.) Another presiding judge testified that he let anyone with a valid ID cast a provisional ballot in his precinct, knowing that "it is not supposed to be like that." (Hr'g Tr. (Moore) 2–232 to 2–233.) One poll worker testified that she voted provisionally in the precinct she worked at on Election Day rather than her correct precinct, knowing that her ballot would not be counted. (Hr'g Tr. (Haynes) 8–173 to 8–175.)

Testimony from voters further illuminated the conduct of poll workers tasked with processing provisional voters on Election Day. One voter testified that she was directed to multiple precinct tables within the same polling location, only to cast a provisional ballot at the wrong precinct table within the correct polling location. (Hr'g Tr. (T. Hill) 7–19 to 7–22.) Poll workers did not tell her she was casting her vote at the wrong precinct table, nor did poll workers tell her that her ballot would not count if it was cast in the wrong precinct. (*Id.* at 23.)

A voter who had recently moved testified that she went to the polling location for her former address on Election Day, that she informed poll workers that she had moved outside the precinct, that she filled out a change of address form, and that poll workers instructed her to vote provisionally at that precinct. (Hr'g Tr. (Ornelas) 5–142 to 5–144.) This voter cast a provisional ballot in the wrong precinct. (*Id.*) Poll workers did not tell her that her vote would not count if cast in the wrong precinct. (*Id.*) Another voter testified that she attempted to vote at one polling location, was directed to a second polling location, and that she was instructed to vote provisionally at that second location. (Hr'g Tr. (John) 3–208 to 3–209.) This voter cast a provisional ballot at the wrong precinct. (*Id.*) Poll workers did not tell her that she was voting at the wrong precinct and did not warn her that her ballot would not count if cast at the wrong precinct. (*Id.* at 210.)

In sum, the testimony revealed a chaotic process in which, despite their training, some poll workers did not know that a ballot cast in the wrong precinct would not be counted, some poll workers understood that voters had to cast their ballot in the correct precinct but failed to confirm that the voter was in the right precinct before giving the voter a provisional ballot, and some poll workers did not direct voters to

the correct precinct because they made mistakes when using the complicated precinct voting location guide. Voters generally did what poll workers told them to do. There was no evidence that any poll worker ever instructed a voter to go to a different precinct table within a location to cast a ballot and the voter refused.

## 5. Processing the Ballots

After the election, the task of tabulating the results of the regular and absentee ballots and verifying the eligibility of provisional ballots fell to employees at the Hamilton County Board of Elections. Poland established the criteria for how Board staff were to examine provisional ballot envelopes based on Secretary of State directives, and the director, deputy director, and board members reviewed those criteria. (Hr'g Tr. (Krisel) 1–34.) All four Board administrators were involved in overseeing the staff who reviewed the provisional ballot envelopes. (Hr'g Tr. (Krisel) 1–34.)

### a. Provisional Ballot Verification

On election night, after all the polls were closed, the Board reported unofficial results for the Hamilton County Juvenile Court Judge race that showed Williams received 112,359 votes and Hunter received 109,512 votes, a difference of 2847 votes. This number included substantially all regular ballots cast on election day and by absentee voters. There remained more than 10,500 provisional ballots to be reviewed and processed by the Board. Bipartisan teams of Board staff began their review of the provisional ballot envelopes on Thursday, November 4, and the review process continued through November 15. (Hr'g Tr. (Krisel) 1–80.)

The Board staff relied on several Secretary of State directives to guide them in their review of the provisional ballot envelopes: Directive 2008–101, which involved provisional ballot review; Directive 2010–48, which involved the NEOCH Consent Decree; and Directive 2010–74, which was a reissue of Directive 2008–101. (Hr'g Tr. (Krisel) 1–81; (Poland) 7–259.) The Board of Elections synthesized these lengthy and detailed directives concerning counting provisional ballots into a two-page document titled, "Provisional Envelope Verification." (JX 5.) The staff used that document to guide them through the processing of the provisional ballot envelopes. (Hr'g Tr. (Krisel) 1–82; (Poland) 5–99 to 5–101.)

The Provisional Envelope Verification document directed staff to verify the individual's eligibility to cast the provisional ballot by reviewing the voter registration database and ensuring that the voter was registered and eligible based on the individual's name, address, signature, identification, and date of birth indicated on the provisional ballot envelope. (JX 5.) Following review of each provisional ballot envelope, staff were directed to check either the "accept" or "reject" box on the back of the envelope, record the old and new precinct name and number on the front of the envelope, and then place the envelope in one of the following trays: "to be counted," "other Ohio county," "not registered," "no signature," "no printed name," "wrong precinct," "voted absentee," "incomplete envelopes," "invalid address," "no ballot,"[19] "additional information required," or "further review." (Id.)

To determine whether a person voted in the precinct in which he or she resided, board staff looked at the voter's current address written in step two on the provisional ballot envelope, looked up that address in the Board's voter registration

---

**19.** A small hole in the center of the provisional ballot envelope allows staff to see whether the envelope contains a ballot or whether the envelope is empty. (Hr'g Tr. (Poland) 5–101.)

system to determine what precinct that address was in, and then wrote the precinct number associated with that address in a designated area of the envelope under the word "NEW." (Hr'g Tr. (Poland) 7–268.) The staff then compared whether the label on the envelope designating the precinct in which the ballot was cast matched the precinct associated with that voter's current address as determined by board staff. (*See, e.g.*, JX 12 at 13 (excerpted below).)

If the precinct label on the envelope (box at top left) did not correspond with the precinct associated with the voter's current address (written below "NEW"), the staff member marked the envelope "W.P." for "wrong precinct" and placed the provisional ballot envelope in the "wrong precinct" bin. (Hr'g Tr. (Poland) 7–269 to 270.) In the example above, the voter voted in precinct Cincinnati 5–K. Her correct precinct was Cincinnati 5–H. Both these precincts were in the same location on Election Day. (*See* DX 1008 at 4 (Knox Presbyterian Church).)

### b. *NEOCH* Provisional Ballot Review

Poland, who was in charge of the process for verifying the eligibility of provisional ballot envelopes, was familiar with Secretary of State Directives 2010–48 and 2010–74 which set forth the provisional ballot processing requirements of the *NEOCH* Consent Decree. (Hr'g. Tr. (Poland) 5–118 to 119.) Poland was aware that these directives prohibited the rejection of a provisional ballot cast by a voter who used the last four digits of his or her social security number as identification (1)

when the ballot was cast in the wrong precinct but the correct multi-precinct polling location for reasons attributable to poll-worker error or (2) when the voter did not properly complete or sign the affirmation statement for reasons attributable to poll-worker error. (*Id.* at 5–119 to 120.)

Because of these directives, after completing the provisional ballot verification process and sorting the ballots into bins, Board staff revisited the provisional ballot envelopes in the "wrong precinct" bin. Staff reviewed the face of these "wrong precinct" envelopes and separated out those for which the voter supplied the last four digits of his or her social security number as a form of identification. (Hr'g Tr. (Poland) 5–108 to 5–109.) In doing this envelope review, the staff looked only at the bottom right side of the provisional ballot envelope which included a signature line for the "witnessing election official" and the "ID PROVIDED ☐ YES ☐ NO" text. (*See* example excerpted above). Board staff did not separate out those envelopes with the "YES" box checked even if the poll worker had indicated on

the back of the envelope that the voter used only the last four digits of his or her social security number as identification. (Hr'g Tr. (Poland) 7–200 to 201.) In other words, the staff sorted out only those provisional ballot envelopes on which the poll worker had checked the "NO" ID box or did not check either box *and* on which the poll worker indicated on the back of the envelope that the voter provided the last four digits of his or her social security number as identification.

Staff took those envelopes and checked to see whether the person had voted in the correct polling location. (Hr'g Tr. (Poland) 5–111.) If so, staff then turned to the notes page of the provisional signature pollbook to determine if poll workers had made any notes about that provisional ballot. If there were notes, staff were instructed to photocopy and attach them to the provisional ballot envelope and place in a tray for further review. (*Id.*) The staff found no notes regarding any of these provisional ballots and thus put no ballots in the "further review" tray. (*Id.*) Staff did not make a list of which or how many "wrong precinct" provisional ballot envelopes they separated out because the voter used the last four digits of his or her social security number as identification, nor did staff make any identifying notation on those provisional ballot envelopes. (Hr'g Tr. (Poland) 5–109 to 5–110.)

Poland knew that Directive 2010–74 pertaining to the *NEOCH* Consent Decree instructed, "if a board of elections finds multiple provisional ballots voted in the correct polling location but wrong precinct, it *should,* either in writing . . . or in a public meeting of the board, question the poll workers in that polling location to determine whether they followed the board's instructions for ensuring that voters were directed to the correct precinct." (*Id.* at 134 (emphasis added).) Poland interpreted the word "should" as "may" and

thus did not believe the Board had to question poll workers if multiple provisional ballots were cast in the correct polling location but wrong precinct. (*Id.* at 133.)

Whereas the staff did some additional review of wrong precinct ballots to see if any fell within the requirements of the *NEOCH* Consent Decree or directives, the staff did no further review of any provisional ballots that failed the verification process because of "no signature" or "no printed name," even though the *NEOCH* Consent Decree also prohibits the rejection of ballots cast by voters using the last four digits of their social security number as identification if the voter failed to properly complete the affirmation statement for reasons attributable to poll-worker error.

Poland was aware that Directive 2010–74 specified that if a voter failed to sign the provisional ballot affirmation statement, "the board of elections *should,* either in writing, with written response from the poll worker, or at a public meeting of the board, question the poll workers in that precinct to determine whether they followed the Board's instructions for completing the verification statement, both as to the specific ballot in question and in general on Election Day." (Hr'g. Tr. (Poland) 5–132 to 133 (emphasis added).) Again, Poland interpreted the word "should" in the above Directive as "may" and thus did not believe the board had to question poll workers in that precinct if a voter failed to sign the provisional ballot affirmation statement. (*Id.* at 133.)

At the end of the provisional ballot envelope review, staff had not separated out any *NEOCH* ballots for the Board to consider separately during its meeting to vote on which provisional ballots to accept for opening and counting.

### 6. Board Meetings to Accept or Reject Provisional Ballots

At an open meeting at the Board of Elections on November 16, 2010, Poland presented the provisional ballot envelopes,[20] separated into categories, to the four Board members so they could vote whether to accept or reject the ballots. (Hr'g Tr. (Krisel) 1–86; see also JX 28 trans. 11/16/11 Bd. Mtg.)

First, the Board unanimously and without significant discussion voted to count a group of 8260 ballots that the bipartisan teams of staff had found to be eligible for counting. (JX 28 at 23–29.) Thereafter, Poland presented the Board with provisional ballot envelopes either singly or in groups of envelopes that had similar issues. The Board proceeded to vote on whether to accept or reject these provisional ballot envelopes after soliciting the Board staff's recommendations and, occasionally, the advice of legal counsel. At no time did the Board consider approving provisional ballots cast by unregistered voters. All of the provisional ballot groups discussed below were comprised of ballots cast by qualified, registered Hamilton County voters.

The Board had been in session only a few minutes when its members were confronted with the fact that poll workers had made mistakes when processing provisional voters on Election Day. Specifically, Poland presented the Board with a group of 686 provisional ballots in which poll workers provided contradictory information on the envelope: they checked that the voter provided ID but also checked that the voter was required to provide additional information to the Board. (JX 28 at 29–30.) Poland explained that the voters who had cast those ballots all were registered and had voted in the correct precinct and, therefore, the staff determined that the ballots were eligible to be counted. (JX 28 at 29–30.) David Stevenson, the Board's legal counsel and assistant Hamilton County Prosecutor, agreed with the staff's recommendation to accept those ballots, saying "I think ... that falls within demonstrated poll-worker error under Secretary of State Brunner's directive regarding that issue." (JX 28 at 32.) The Board members then voted unanimously to accept that group of ballots. (JX 28 at 33.)

Poland then presented to the Board the group of provisional ballot envelopes that are the primary focus of this lawsuit: 849 provisional ballot envelopes that the staff determined had been voted in the wrong precinct. (Id. at 34.) Poland informed the Board that this group was not eligible to be counted. (Id. at 35.) Krisel noted that, "[t]hese [849 provisional ballot envelopes] don't include the ones who voted in wrong precinct, but used their social security, last four digits of their social security, voted at the right poll location, wrong table and demonstrated poll-worker error, so we will be taking those up soon." (Id. at 35.)[21]

Board member Faux asked whether the group of 849 ballots in consideration included those where people went to the

---

20. Poland presented 10,545 provisional ballot envelopes to the Board on November 16, 2010. (JX 28 at 162.) The Secretary of State's final summary of provisional ballots issued in each Ohio county indicates that Hamilton County issued a total of 10,536 ballots. (JX 33.) The Court is unable to locate in the record an explanation for this discrepancy but concludes that the actual number of provisional ballots issued is that reflected in the Secretary of State's summary: 10,536.

21. In fact, ballots that fell into the category so described by Krisel were not taken up at the meeting because the staff had not separated out any ballots that fell into the so-called NEOCH ballot category for the Board to review. Despite Krisel's statement that a discussion of those ballots would occur, there was no discussion during the meeting about any NEOCH ballots.

correct building but voted at the wrong precinct table within that building and was told yes. (*Id.* at 36.) When Faux asked how many of the 849 were cast in the correct location, Poland said she did not know because the staff did not create a category of correct building, wrong precinct ballots. (*Id.* at 36.) Faux expressed concern about disqualifying the votes of people who "took the time to go to the polls [and] got to the right building" but who voted at the wrong table because they were given wrong directions by poll workers. (*Id.* at 36–37.) A discussion ensued during which attorney Stevenson said that a vote in the wrong precinct was not eligible to be counted even if the voter went to the right location. (*Id.* at 37–39.) Accordingly, the Board members voted unanimously to disqualify the group of 849 provisional ballots cast in the wrong precinct, including those cast in the correct location. (*Id.* at 40.)

The next group of ballots Poland presented to the Board were 27 provisional ballots that were cast at the Board of Elections' downtown office during the 28–day period prior to election day and that were voted in the wrong precinct. (*Id.* at 40.) Krisel explained that staff working at the Board office gave the voter the wrong ballot. (*Id.* at 40.) Faux asked, "[s]o this is clear poll-worker error?" and Poland replied "[r]ight." Board staff member Joe Mallory recommended that the ballots be "remade to the proper precinct the person was able to vote in" and then counted as valid ballots. (*Id.* at 40–41.) Poland reit-

erated that the staff unanimously agreed that "this is poll-worker error," and attorney Stevenson agreed that "the suggestion of the staff [to remake and count the ballots] is appropriate." (*Id.* at 41–42.) Chairman Triantafilou asked Mallory to explain why the staff thought there was clear poll-worker error in the case of the provisional ballots cast at the Board office. Mallory explained that the worker at the Board office must have either looked up the voter's address wrong in the voter registration system or pulled the wrong ballot and gave it to the voter. (*Id.* at 43.) Chairman Triantafilou clarified, "the reason poll-worker error is demonstrated here is because the voter had no choice but to walk up to just one person." (*Id.* at 44.) The Board members then voted unanimously to accept the group of provisional ballots cast at the Board office that were voted in the wrong precinct. (*Id.* at 45.)

The Board also followed the staff's recommendation to reject all 62 provisional ballot envelopes on which the voter failed to print his or her first and last name in the written affirmation statement at the top of the envelope. (*Id.* at 50, 55–57, 63; JX 33 at 2.) [22] Likewise, the Board voted to reject provisional ballot envelopes on which someone other than the voter or no one signed the envelope affirmation statement. (*Id.* at 63–70, 72; JX 33 at 2.) [23]

Poland presented numerous other provisional ballot envelopes to the Board that lacked the voter's complete printed name or signature, but the staff had determined

---

**22.** In several cases, the voter had printed his or her first or last name, but not both, in the affirmation statement at the top of the envelope. After a short discussion during which Board member Faux protested that the poll worker should have looked at the ballot envelope and confirmed that the voter had included a first and last name in the affirmation before processing the envelope, the Board in

a three-to-one vote rejected that group of ballots. (*Id.* at 55–57, 61.)

**23.** Faux objected to the motion to reject envelopes on which the poll worker signed in the place of the voter, stating that it seemed the poll worker erred in signing on the voter signature line. (*Id.* at 63–66.) However, in a three-to-one vote, the Board rejected those ballots. (*Id.* at 67.)

that the poll worker should have let the voter cast a regular, not a provisional, ballot. (*Id.* at 57–58, 59, 61, 71, 113.) For example, one poll worker required an individual to vote provisionally because of the stated reason that the individual lacked identification, but the poll worker had correctly recorded the individual's drivers' license number on the envelope. (*Id.* at 59.) The Board voted unanimously to count the ballot. (*Id.* at 61.) In the same vein, the Board voted unanimously to accept a provisional ballot where the voter was in the correct precinct and should not have been required to cast a provisional ballot, but the poll worker incorrectly indicated that the signature pollbook dictated that the individual vote provisionally. (*Id.* at 113.) The Board voted unanimously to count these ballots. (*Id.*)

The Board continued to consider, on an envelope-by-envelope basis, numerous provisional ballot envelopes where there was a problem with the address written on the envelope by the voter. The Board proceeded to reject certain ballots with invalid addresses and accept others with invalid addresses. (*Id.* at 91 (accept ballot); 93 (accept ballot); 94 (reject ballot); 95 (reject ballot), 96 (reject ballot); 97 (accept ballot); 98, 100–101 (accept ballot).) Generally, if the staff were able to find information on or attached to the envelope or in the signature pollbook that indicated the voter lived at an address that was in the precinct, the Board voted to accept the ballot.

Throughout the November 16, 2010 meeting, Poland presented to the Board envelopes with a myriad of different problems. There were several instances in which a voter had been given two ballots by poll workers and the Board struggled to discern whether two ballots were actually voted (one scanned and one placed in a provisional ballot envelope) or whether only one ballot was actually voted (the ballot in the provisional ballot envelope). As articulated by Board member Faux, "again ... the only reason we're in [a] quandary to begin with is a lack of clarity in the information that was provided to us by the inside poll workers as to exactly what they did." (JX 28 at 117.) The Board voted to accept those provisional ballots, presuming that the poll workers had caught the fact that these voters were supposed to vote provisionally and not scan the originally presented ballot. (*Id.* at 118, 121–22, 129.) In another case, the Board rejected the ballot of a voter who had been made to vote provisionally, even though he presented at the correct precinct with proper identification, because someone else had already signed his name in the precinct's signature pollbook. (*Id.* at 123–26.) Rather than accept that the poll worker may have allowed the wrong individual to sign the pollbook, three of the four Board members voted to reject the provisional ballot on the assumption that the voter must have tried to vote twice. (*Id.*)

Stated concisely, there were two circumstances (relevant to this case) in which the Board lawfully could have considered poll-worker error: (1) when the voter used the last four digits of his social security number as identification and cast his provisional ballot in the correct polling place but wrong precinct, and (2) when the voter used the last four digits of his social security number as identification and did not complete or properly complete and/or sign the provisional ballot application/envelope. (*NEOCH* Consent Decree.) This fact was expressly discussed during the November 16 Board meeting. For example, when Faux asked about right-location, wrong precinct ballots, Krisel reminded him, "The only ones that we're allowed to consider are the ones who used the last four digits of their social security number ... as their identification." (Bd. Mtg. Tr.

11/16/2010, JX 28 at 35.) Later Gerhard asked for clarification on this point: "It's my understanding that Ohio law is clear on this issue that unless there is a demonstration of poll worker error and they provide the last four digits of their social security number[, t]hese votes are invalid and should not be counted, is that correct?" (*Id.* at 37.) And yet, at no time during that meeting did the Board consider whether there was any evidence of poll-worker error as to the provisional ballots that fell into those two categories. They didn't consider whether poll-worker error was a potential reason for those ballots' fatal flaws because the staff never separated out ballots on which voters used their social security number as identification for the Board to review.

Ironically, while failing to consider poll-worker error in the instances in which it was *required to do so* by the *NEOCH* Consent Decree, the Board *did* consider poll-worker error in circumstances that did *not* involve voters who used the last four digits of their social security number as identification: first, with the group of 686 ballots that had contradictory information regarding whether the voter provided identification, and second with the group of wrong-precinct ballots cast at the Board office. In other words, the Board conscripted the concept of poll-worker error from the *NEOCH* Consent Decree and applied it to ballots that were not subject to that Decree.

Three days after the initial Board meeting, on November 19, 2010, the Board held a special meeting during which they again voted to accept or reject provisional ballots. This second meeting occurred for two reasons: First, staff had further reviewed or processed some of the provisional ballot envelopes the Board had voted on at the November 16, 2010 meeting and discovered additional information that the Board needed to consider. (Bd. Mtg. min.

11/19/2010, JX 32 at 2–3.) Second, staff needed Board approval of provisional ballots envelopes that were in some way flawed and which the staff had "remade" to bring them into conformity with acceptable ballot requirements. These "remakes" included damaged ballots, those on which voters had made corrections, and those on which the voter had been given the wrong ballot. (*Id.*)

Included in the provisional ballot envelopes presented to the Board on November 19 meeting were four cast at the Board office and which the Board had approved for counting during the November 16 meeting. However, upon opening the envelopes, Board staff discovered that the ballot inside was from a different precinct than the correct precinct that appeared on the face of the envelope. (JX 32 at 3; Hr'g Tr. (Krisel) 1–90.) The Board voted to remake these ballots to the correct precinct and count them. (*Id.*)

The Board then conducted the official count that included all ballots approved for counting to date. (JX 32 at 4; Hr'g Tr. (Krisel) 1–99.) The Board voted to count 8999 and reject 1537 provisional ballots. (JX 33.) The rejected ballots fell into eight categories: voter not registered in the state (440 ballots), voter registered in the state but voted in wrong precinct (849 ballots), failed to provide acceptable identification (67 ballots), no voter signature on envelope (60 ballots), no printed name on envelope (62 ballots), voter already voted (22 ballots), and other reasons (25 ballots). (JX 33.) Thus, the largest category of rejected provisional ballots, which is the primary focus of this case, were those that had been cast in the wrong precinct. (*Id.;* Hr'g Tr. (Krisel) 1–83.)

The official vote count for the seat of Juvenile Court Judge on November 19 showed that Williams, with 114,989 votes, defeated Hunter, with 114,966 votes,—a

difference of 23 votes. (JX 21 at 9.) The race was therefore subject to a mandatory recount under O.R.C. § 3515.01, which requires the board of elections to order a recount when the winning candidate has won by a margin of less than one-half of one percent.

## C. *Hunter* and *Williams* Litigation and Subsequent Events

### 1. Hunter Initiates this Lawsuit

On November 21, 2010, Hunter filed a verified complaint and a motion for a temporary restraining order seeking declaratory and injunctive relief under 42 U.S.C. § 1983 against the Board and its four members in their official capacities for asserted violations of the Equal Protection Clause and Due Process Clause. The complaint focuses on the 849 provisional ballots rejected by the Board because they were miscast in the wrong precinct. Hunter claims the Board violated the Equal Protection Clause by "by refusing, without any reasonable basis, to investigate whether poll-worker error caused some voters to vote at the right polling place but at the wrong table while otherwise investigating similarly situated circumstances where poll-worker error caused a voter to vote in the wrong precinct," and "by arbitrarily allowing some provisional voters the right to vote when the error in the ballot was caused by the poll worker, but denying other provisional voters the right to vote when the error in the ballot was caused by the poll worker." (Doc. 1 at ¶ 38.) Hunter also alleges that the Board's "system of rejecting provisional ballots is so unfair that it denies or fundamentally burdens Ohioan's fundamental right to vote." (*Id.* at ¶ 39.)

*NEOCH* and the Ohio Democratic Party intervened as plaintiffs, alleging that some of the disputed ballots appeared to be subject to the *NEOCH* Consent Decree. Williams, the putative Hamilton County Juvenile Court Judge Elect, also intervened as a defendant.

On November 22, 2010, following an emergency hearing, this Court issued a preliminary injunction directing the Board to "immediately begin an investigation into whether poll worker error contributed to the rejection of the 849 provisional ballots now in issue and include in the recount of the race for Hamilton County Juvenile Court Judge any provisional ballots improperly cast for reasons attributable to poll worker error." (Doc. 13 at 9; also *Hunter v. Hamilton Cnty. Bd. of Elections,* 2010 WL 4878957 (S.D.Ohio Nov. 22, 2010).) This Court issued the order after receiving evidence that, despite state law prohibiting the counting of provisional ballots cast in the wrong precinct, the Board had counted some provisional ballots cast in the wrong precinct due to poll-worker error.[24]

### 2. Secretary of State Directives and Subsequent Investigation by the Board

Following this Court's November 22 order, Secretary Brunner issued Directive 2010–79, which was specifically directed to the Board and detailed the "process for determining the validity of provisional ballots" in accordance with the *NEOCH* Consent Decree. Secretary Brunner then issued Directive 2010–80, which provided "additional guidance to the [Board] with regard to the investigation of the 849 pro-

---

24. Williams subsequently appealed this Court's November 22 Order and moved for a stay in the Sixth Circuit Court of Appeals. The Sixth Circuit temporarily stayed this Court's order pending review by a full panel of the court. The panel later dissolved the stay, noting that this Court did not abuse its discretion in granting the preliminary injunction. Case No. 10–4481, Dec. 1, 2010 Order.

visional ballots, as ordered [by the district court]." Both Directive 2010–79 and Directive 2010–80 provided "objective criteria for determining poll worker error." On December 17, 2010, Secretary Brunner issued Directive 2010–87, which ordered the Board to subpoena and question all poll workers in the precincts in which the 849 provisional ballots in issue were cast.

The Board subsequently began investigating the disputed ballots, subpoenaing over four-hundred poll workers. (Doc. 38–7.) The Board interviewed over seventy poll workers at Board meetings held on December 16 and 17, 2010. (Docs. 38–7 at 2 and 38–3.) On December 20, 2010, with the permission of Secretary Brunner, the Board stopped interviewing poll workers and instead sent out questionnaires to the remaining 1500 poll workers. (Doc. 38–4.) The Board received back 830 completed questionnaires. (Doc. 38–4.)

On December 28, 2010, the Board met to vote on the results of its investigation for poll-worker error. The Board unanimously determined that there was no evidence of poll-worker error with respect to all the ballots cast in the wrong location and wrong precinct and voted not to approve for counting those 565 provisional ballots. (JX 27 Tr. Bd. Mt'g; DX 1018.) The Board voted unanimously to approve for counting nine ballots that were determined to have been cast in the correct precinct all along but erroneously had been put by Board staff with the rejected "wrong-precinct" ballots. (Id.) The Board voted unanimously to approve for counting seven wrong precinct ballots that the Board determined from its investigation, including interviewing poll workers, were miscast on the account of poll-worker error. (Id.) Finally, the Board tied 2–2 on whether to count 269 ballots that were cast in the correct polling location but in the wrong

precinct. (Id.) The Board submitted the tie vote to Secretary Brunner.[25]

### 3. *State ex rel. Painter v. Brunner*

In the meantime, on December 20, 2010, Williams and John W. Painter, a Hamilton County voter, petitioned the Ohio Supreme Court for a "writ of mandamus correcting the misdirected post-election and post-election certification instructions of the Secretary of State and stopping the process that is based on those instructions." (Doc. 29–1.) Plaintiffs then filed an emergency motion in this Court on December 23, 2010 to enjoin the state-court proceedings. This Court denied Plaintiffs' motion, concluding that "[i]t is within the province of the Ohio Supreme Court to determine whether [Secretary Brunner's] directives comply with state law governing election procedures." (Doc. 32.)

On January 7, 2011, the Ohio Supreme Court issued a decision, granting the writ of mandamus. Specifically, the Ohio Supreme Court issued an order

> to compel the secretary of state to rescind Directives 2010–80 and 2010–87 and to compel the board of elections to rescind its decisions made pursuant to those directives and to instead review the [849] provisional ballots that are the subject of [the federal district court's] order and are not subject to the consent decree in *Northeast Ohio Coalition for the Homeless*, with exactly the same procedures and scrutiny applied to any provisional ballots during the board's review of them leading up to its decision on November 16, without assuming that poll-worker error occurred in the absence of specific evidence to the contrary.

---

**25.** Under Ohio law, the Secretary of State casts the tie-breaking vote when the Board of Elections is deadlocked. O.R.C. § 3501.11(X).

*State ex rel. Painter v. Brunner,* 128 Ohio St.3d 17, 33, 941 N.E.2d 782 (2011). The Ohio Supreme Court observed that in its view,

[a]t best, any equal-protection claim would have merely required the same examination that the board conducted in concluding—incorrectly under Ohio law—that 27 provisional ballots cast in the wrong precinct at the board of elections during the early-voting period should be counted, even though they were cast in the wrong precinct due to poll-worker error. That review was limited to an examination of the poll books, help-line records, and provisional-ballot envelopes and emanated from the uncontroverted evidence that these ballots were cast in the wrong precinct due to poll-worker error.

*Id.* at 21–22, 941 N.E.2d 782.

### 4. Subsequent Directives and Orders

Following *Painter,* on January 7, 2011, Secretary Brunner issued two directives to the Board. The first, Directive 2011–02, rescinded Directives 2010–80 and 2010–87 in accordance with *Painter.* The second, Directive 2011–03, related to the Board's tie vote on the 269 ballots. Secretary Brunner rejected counting all 269 ballots but, based on an analysis conducted by Board member Caleb Faux, directed the Board to count approximately 56% of the 269 ballots cast in the wrong precinct but correct polling location.[26]

On January 10, 2011, current Ohio Secretary of State Jon Husted took office and issued a directive superceding Secretary Brunner's Directive 2011–03. *See* Directive 2011–04. Citing *Painter,* Secre-

tary Husted's Directive 2011–04 instructed the Board to

determine now, as it did on November 16, 2010, based solely on its examination of election records, poll books, help-line records, and provisional-ballot envelopes (i.e., the same evidence the board considered at its November 16, 2010, meeting) that the [849] ballots cast in the wrong precinct are, according to Ohio statutes, invalid and shall not be counted,

and "to certify the results of the election" accordingly. *Id.*

On January 11, 2011, Plaintiffs filed an emergency motion in this Court to enforce the preliminary injunction and enjoin the Board from complying with Directive 2011–04. (Doc. 38.) On January 12, 2011, this Court granted in part the motion to enforce the preliminary injunction, stating:

The Board is hereby (1) enjoined from complying with Secretary of State Directive 2011–04; (2) ordered to count the 149 ballots that were investigated and found to have been cast in the wrong precinct due to poll worker's error in determining whether the street address was located inside the precinct; (3) ordered to count the seven ballots that were investigated, found to have been cast in the wrong precinct due to poll worker error, and unanimously voted upon at the Board's December 28, 2010 meeting; (4) ordered to count the nine ballots that were investigated, found to have been cast in the correct precinct but were rejected due to staff error, and unanimously voted upon at the Board's December 28, 2010 meeting;

---

**26.** Specifically, Secretary Brunner directed the Board to count the ballots of voters whose addresses were (1) "on the wrong side of a boundary street of the precinct in which the voter should have cast a ballot" (approximately 31% of the 269); (2) "outside of the address range of a boundary street of the precinct in which the voter should have cast a ballot" (approximately 15% of the 269); and (3) "on streets that pass through the precinct in which the voter voted, but the address[] did not fall within the correct address range of the precinct in which the voter should have cast a ballot" (approximately 10% of the 269).

and (5) ordered to investigate all ballots subject to the *NEOCH* Consent Decree for poll worker error and count those ballots as required by that Consent Decree.

(Doc. 39.)

Also on January 12, 2011, Secretary Husted issued another directive to the Board directing them to (1) "examine the provisional ballots that are the subject of [this Court's] order and are not subject to [the *NEOCH* Consent Decree], consistent with the Ohio Supreme Court's January 7, 2011 [decision] in *Painter* by examining only the poll books, help-line records, and provisional-ballot envelopes"; (2) "examine those provisional ballots that are subject to the [*NEOCH* Consent Decree—*i.e.*, those cast by voters using their last four digits of their Social Security number as identification], in accordance with the requirements of Directives 2010–74 and 2010–79"; and (3) count nine provisional ballots that were cast in the correct precinct but erroneously included in the group of 849 "wrong precinct" ballots. Directive 2011–05.

On January 14, 2010, Plaintiffs filed a motion to show cause "why the Board should not be held in contempt for its failure to follow" this Court's orders dated November 22 and January 12. (Doc. 44.) This Court granted the motion and ordered the Board to appear on January 18, 2010. Williams then filed a notice of appeal of this Court's January 12 order. (Doc. 46.) Later on January 14, 2010, this Court entered an order enjoining the Board from complying with Ohio's statutory deadline to amend the certification of the election results by January 22, 2011. (Doc. 47.) On January 16, 2010, the Board filed a notice of appeal of the district court's January 12 order and, on January 17, 2010, the Board filed a motion to stay the January 12 order and any further district-court proceedings.

### 5. Sixth Circuit Appeal

On January 27, 2011, the Sixth Circuit issued a decision affirming the November 22 preliminary injunction and affirming in part and vacating in part the January 12 order. With regard to the November 22 preliminary injunction, the Sixth Circuit held:

> We conclude that the district court did not abuse its discretion in granting the November 22 preliminary injunction ordering the Board to "immediately begin an investigation into whether poll worker error contributed to the rejection of the 849 provisional ballots now in issue and include in the recount of the race for Hamilton County Juvenile Court Judge any provisional ballots improperly cast for reasons attributable to poll worker error." We also conclude that Plaintiffs have shown a strong likelihood of success on the merits of their equal-protection claim and that the balance of harms favors Plaintiffs.

*Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d 219, 247 (6th Cir.2011).

As to the January 12 order, the Sixth Circuit vacated the portion of the order directing the Board to count specific ballots, concluding that it was error for this Court to identify which ballots were miscast due to poll-worker error prior to affording Defendants notice and an opportunity to be heard. The Sixth Circuit affirmed the January 12 order to the extent that it requires the Board to investigate and count ballots subject to the *NEOCH* Consent Decree. The Sixth Circuit then remanded to this Court concluding:

> We leave to the district court in the first instance, applying the uniformity requirement of *Bush v. Gore*,[27] to direct the Board how to proceed regarding the

---

**27.** 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000).

9 ballots unanimously determined by the Board to have been cast in the correct precinct, the 7 ballots unanimously determined by the Board to have been miscast because of poll-worker error, the 269 ballots cast in the correct location but wrong precinct in which the determination of poll-worker error remains disputed, and, pursuant to the *NEOCH* Consent Decree, the NEOCH ballots.

*Id.* Upon receipt of the mandate, this Court scheduled a full and final hearing on the merits. The hearing began July 18, 2011 and concluded August 5, 2011. The evidence set forth at the hearing is encompassed in the above Findings of Fact.

## IV. CONCLUSIONS OF LAW

Having set forth the facts of the case, the Court now proceeds to resolve the questions of law that determine the outcome.

### A. Equal Protection

The framework for the judgment on Plaintiffs' equal protection claim was built and tested during the proceedings on Plaintiffs' Motion for a Preliminary Injunction. This Court found, at that early stage and on a sparse record, that Plaintiffs were likely to succeed on the merits of their claim that the Board violated provisional voters' right to equal protection under the laws when it "—without any specific statutory mandate—carved out situations in which it *will* count provisional ballots cast in the wrong precinct." (Doc. 13 at 6, 2010 WL 4878957, at *4.) Relying on the "fundamental premise that 'equal weight [be] accorded to each vote,'" this Court concluded that because the Board took evidence of poll-worker error into consideration for the 27 ballots cast in the wrong precinct at the Board's office, it had to do the same for all provisional ballots cast in the wrong precinct. (Doc. 39 at 8

(quoting *Bush v. Gore*, 531 U.S. at 104, 121 S.Ct. 525).)

The Sixth Circuit agreed. On appeal, it "affirm[ed] the likelihood that the intrajurisdictional unequal treatment undertaken by the Hamilton County Board is constitutionally impermissible" and held that "[t]he Board arbitrarily treated one set of provisional ballots differently from others, and that unequal treatment violates the Equal Protection Clause." *Hunter*, 635 F.3d at 242. The court so concluded because the Board considered evidence of poll-worker error in its review of some wrong-precinct ballots but did not consider such evidence with respect to other wrong-precinct ballots. "In particular," the Sixth Circuit explained,

the Board explicitly refused to separate from the 849 wrong-precinct ballots those ballots cast at the right polling location but wrong precinct. The evidence of poll-worker error with respect to those 269 ballots—that the ballots were cast at the correct multiple-precinct polling location—is substantially similar to the location evidence considered by the Board with respect to the ballots cast at its office. In both cases, there is no direct evidence that the poll worker erred. For the 27 ballots cast at [the Board] office ... [t]he voter went to the correct location, i.e., the Board's office, and the staff at the Board's office was required to give the voter the correct ballot; thus, there is little chance that the voter erred, and the wrong-precinct ballot must be due to poll-worker error. Similarly, at the multiple-precinct polling locations, voters went to the correct location and the poll workers were required to direct voters to the correct precinct.

To be sure, there may be more explanations for why the voter might have erred at the multiple-precinct polling locations

than at the Board office, requiring a greater inference to conclude that the miscast ballot was a result of poll-worker error, but Defendants have not presented any persuasive rationales.

*Hunter,* 635 F.3d at 237.

■ The evidentiary hearing held after the remand gave the Board an opportunity to present "persuasive rationales" for its decision to consider location evidence as to the wrong-precinct provisional ballots cast at its office but not those cast at polling locations. However, the Board failed to do so. Rather, the facts presented at the hearing further demonstrated that the Board arbitrarily considered location evidence for some wrong-precinct provisional ballots and not others and, thus, violated the rights of provisional voters to have their vote counted on equal terms. Accordingly, and for the reasons below, the Court enjoins the Board from rejecting otherwise valid provisional ballots cast in the wrong precinct due to demonstrated poll-worker error. This includes (1) all provisional ballots cast in the correct polling location but the wrong precinct and (2) all provisional ballots cast in the wrong precinct because of demonstrated poll-worker error as determined by the Board during the course of its December 2010 investigation.

### 1. Legal Standard

The Court will now address the legal arguments of the parties and further explain the grounds for its decision. Plaintiffs bring their equal protection claim under 42 U.S.C. § 1983. "A claim under 42 U.S.C. § 1983 has two elements: (1) the defendant must be acting under the color of state law, and (2) the offending conduct must deprive the plaintiff of rights secured by federal law." *League of Women Voters of Ohio v. Brunner,* 548 F.3d 463, 475 (6th Cir.2008). Defendants make several arguments regarding the legal sufficiency of Plaintiffs' equal protection claim. The Court will resolve these issues before discussing the facts of the case.

■ First, Defendants argue that the actions of poll workers cannot support a § 1983 claim against the Board members since the poll workers are not named defendants. This argument misconstrues Plaintiffs' equal protection claim. Plaintiffs do not allege that poll-worker error deprived them of their right to have their vote counted on equal terms with others. Rather, Plaintiffs allege that the Board's inconsistent treatment of provisional ballots deprived them of their right to equal protection. Defendants do not dispute that Board members were acting under color of state law. Thus, Plaintiffs adequately alleged a § 1983 claim against the Board.

■ Next, Defendants argue that Plaintiffs failed to state an equal protection claim against the Board because they did not allege and cannot prove that the Board acted with "intentional or purposeful discrimination," citing *Snowden v. Hughes,* 321 U.S. 1, 8, 64 S.Ct. 397, 88 L.Ed. 497 (1944). The Sixth Circuit expressly rejected this argument, saying:

> The Supreme Court has held in cases since *Snowden* that the Equal Protection Clause protects the right to vote from invidious and arbitrary discrimination. *E.g., Williams v. Rhodes,* 393 U.S. 23, 30, 34, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968).... In particular, the Court has spoken regarding the requirements of the Equal Protection Clause with respect to claims that a state is counting ballots inconsistently. *See Bush* [*v. Gore* ], 531 U.S. at 104–05, 121 S.Ct. 525 ("Equal protection applies ... to the manner of [the] exercise [of the right to vote]. Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that

of another.") (citing *Harper* [*v. Virginia State Bd. of Elections*], 383 U.S. [663] at 665, 86 S.Ct. 1079[, 16 L.Ed.2d 169 (1966) ]); *id.* at 105, 121 S.Ct. 525 ("The question before us, however, is whether the recount procedures the Florida Supreme Court has adopted are consistent with its obligation to avoid arbitrary and disparate treatment of the members of its electorate."). Of great importance, a showing of intentional discrimination has not been required in these cases. Consequently, we reject [the defendant's] argument that there can be no violation of the Equal Protection Clause here without evidence of intentional discrimination.

*Hunter,* 635 F.3d at 234 n. 13. It is therefore clearly established that to succeed on their equal protection claim, Plaintiffs must show only that the Board's actions resulted in the arbitrary and disparate treatment of the members of the electorate.

### 2. Analysis

■ "In decision after decision, [the Supreme] Court has made clear that a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn v. Blumstein,* 405 U.S. 330, 336, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972). The Board puts forth numerous arguments for why its decision to count the 31 wrong-precinct provisional ballots cast at the Board office but no other wrong-precinct provisional ballots did not violate Hamilton County citizens' right to participate in the November 2010 General Election on an equal basis with other citizens in the jurisdiction. None are persuasive.

The Board states that its decision to count the 31 wrong-precinct provisional ballots cast at the Board office, but not the 850 wrong-precinct provisional ballots cast throughout the county, does not constitute a violation of equal protection because the decision to count the 31 was merely a mistaken application of state law.[28] Indeed, the Ohio Supreme Court held as much. *Painter,* 128 Ohio St.3d at 32, 941 N.E.2d 782 ("[U]nder Ohio law, these ballots should not be counted.") The Ohio Supreme Court in *Painter* addressed a limited area of state law with respect to provisional ballots. As the Sixth Circuit observed,

the state-law holdings of *Painter* are that (1) "there is no exception to the statutory requirement that provisional ballots be cast in the voter's correct precinct," *Painter,* 941 N.E.2d at 794; (2) "election officials err in presuming poll-worker error because 'in the absence of evidence to the contrary, [poll workers] … will be presumed to have properly performed their duties in a regular and lawful manner and not to have acted illegally or unlawfully,'" *id.* at 798 (quoting *Skaggs,* 900 N.E.2d at 990) (alteration omitted); and (3) statistical analysis is not proper evidence of poll-worker error, *id.* (citing *State ex rel. Yiamouyiannis v. Taft,* 65 Ohio St.3d 205, 602 N.E.2d 644 (1992)).

*Hunter,* 635 F.3d at 239. However, the Sixth Circuit also observed that these state-law issues do not resolve the federal constitutional questions in this case.[29] *Id.*

---

**28.** The 31 are comprised of the 27 wrong-precinct ballots cast at the Board office that the Board voted on November 16 to count, plus the 4 ballots cast at the Board office that appeared from the envelope to be correct but that actually contained wrong-precinct ballots and which the Board voted on November 19 to count.

**29.** The Sixth Circuit also noted that "[c]onstitutional concerns regarding the review of provisional ballots by local boards of elections are especially great" for two distinct but related reasons. First, the review of those ballots occurs after the initial count of regular ballots is known. *Id.* at 235 (citing John Fortier, *Foley on the Future of Bush v. Gore,* 68 Ohio

Rather, this Court's analysis of the equal protection question is guided "by the important requirement that state actions in election processes must not result in 'arbitrary and disparate treatment' of votes." *Id.* at 234. Simply put, the question is, did the Board apply specific and uniform standards when it decided what constituted evidence of poll-worker error and when it voted to count ballots flawed by poll-worker error? If not, a constitutional violation occurred, state law notwithstanding.

The Board further argues that Ohio's requirement that a person vote in the precinct in which he or she resides is a reasonable, nondiscriminatory restriction such that Ohio's regulatory interests are sufficient to justify the restriction. This argument, too, misses the point. Plaintiffs' equal protection claim does not implicate the Ohio statute that requires a person to vote the ballot associated with the precinct in which he or she resides. Rather, Plaintiffs' claim concerns the uneven exercise of discretion by the Board. The validity of Ohio's requirement that persons vote in the precinct of their residence is not an issue in this case.

The Board then argues that its pre-November 16 investigation did not violate equal protection guarantees because it afforded the same level of review to all provisional ballots cast, with the exception of *NEOCH* ballots. This is truly the heart of the matter. The Board states that it reviewed all provisional ballots using the specific and uniform standards set forth in Directive 2010–74 and that, pursuant to that Directive, it counted only those ballots for which there was "demonstrated" poll-worker error. (Directive 2010–74 at 11.) This requirement—that poll-worker error may not be presumed and must be demonstrated through evidence—stems from the Ohio Supreme Court decision in *State ex rel. Skaggs v. Brunner*, 120 Ohio St.3d 506, 900 N.E.2d 982 (Ohio 2008). In *Skaggs*, the court held that incomplete ballot affirmations could not be presumed to be declinations to execute affirmations that went unnoticed by poll workers. The court stated that, " 'in the absence of evidence to the contrary, public officers . . . will be presumed to have properly performed their duties in a regular and lawful manner.' " *Id.* at 515, 900 N.E.2d 982 (quoting *State ex rel. Speeth v. Carney*, 163 Ohio St. 159, 186, 126 N.E.2d 449 (1955)). However, the court hinted at the type of evidence that could overcome the presumption of regularity: "If we were presented with evidence that the election officials . . . had affirmatively failed to [perform any of their statutorily required actions] because

---

St. L.J. 1051, 1061 (2007)). "This particular post-election feature makes 'specific standards to ensure . . . equal application' particularly 'necessary to protect the fundamental right of each voter' to have his or her vote count on equal terms. The lack of specific standards for reviewing provisional ballots can otherwise result in 'unequal evaluation of ballots.' " *Id.* (quoting *Bush v. Gore*, 531 U.S. at 106, 109, 121 S.Ct. 525).

Second, "the Board's count of provisional ballots is a quasi-'adjudicatory-type' action which, unlike many 'regulatory-type' actions, requires review of evidence with respect to a ballot's validity. *Id.* (citing Edward B. Foley, *Refining the Bush v. Gore Taxonomy*, 68 Ohio St. L.J. 1035, 1037 (2007)).

In other words, the Board is exercising discretion "in making specific determinations about whether particular individuals will be permitted to cast a ballot that counts." *Id.* In contrast to more general administrative decisions, the cause for constitutional concern is much greater when the Board is exercising its discretion in areas "relevant to the casting and counting of ballots," like evaluating evidence of poll-worker error. *Id.*

*Id.* at 235. This post-election discretion, placed in the hands of local officials, must be wielded carefully and consistently in order to avoid not only violating constitutional rights but also losing the public's trust in the outcome of elections.

they were improperly trained or improperly instructed regarding their duties in these circumstances, we may have been persuaded that [voter] declinations could be presumed." *Id.*

The Board contends that it discovered evidence of worker error at the Board office by looking only at the provisional ballot envelopes. It argues that because it did not consider any documents *other than the ballot envelope* when it decided to count the provisional ballots miscast at the Board office because of worker error, it did not violate equal protection guarantees.

There are two flaws in the Board's argument. First, it simply is not true that the Board relied only on the provisional ballot envelopes when voting to accept certain provisional ballots cast in the wrong precinct on the grounds of demonstrated poll-worker error. For 27 of the 31 provisional ballots cast at the Board office, as well as the 850 cast at polling locations across the county, the fact that the ballot was cast in the wrong precinct was apparent from the envelope. This is because the precinct label or precinct number written on the envelope by a worker was not the correct precinct for the voter's current address. However, for 4 of the 31 provisional ballots cast at the Board office that the Board voted to accept, it was *not* apparent from the provisional ballot envelope that it had been cast in the wrong precinct. Rather, the precinct number written on the envelope was correct and matched the voter's current address. It was not until staff opened the envelopes that they discovered the ballot inside was for a different precinct than that written on the envelope. Thus, the Board relied on the envelope *and the ballot itself* when voting unanimously at the November 19 Board meeting to accept those four wrong precinct ballots.

Second, even if the Board did not rely on *documents* other than provisional ballot envelopes when it decided to accept wrong-precinct provisional ballots cast at the Board office, it *did* rely on circumstantial evidence drawn from the location at which the provisional ballots were cast. The relevant inquiry is, did the Board apply uniform standards when deciding what circumstantial evidence comprised "demonstrated" poll-worker error? In short, it did not. This answer is evident when one examines the information available to the Board, and how the Board interpreted and used that information, when it voted on November 16, 2010 Board meeting to count provisional ballots. As the Sixth Circuit discussed, the Board considered "location evidence" with respect to the ballots cast at the Board office, but it then refused to consider "substantially similar" location evidence with respect to the 269 ballots cast at the correct multi-precinct location. *Hunter,* 635 F.3d at 237. The testimony at the hearing shed more light on what transpired before and at the November 16, 2010 Board meeting and strengthens this Courts' preliminary conclusion that a constitutional violation occurred.

On November 16, Board members (rightly or wrongly) understood they were permitted by law to accept ballots with certain flaws attributable to demonstrated poll-worker error. (*See, e.g.,* Nov. 16, 2010 Bd. Mtg. Tr., JX 28, at 32 (Mr. Stevenson advising the Board to process ballots on which poll workers indicated contradictory information regarding whether the voter had provided valid identification because "that falls within demonstrated poll-worker error under Secretary of State Brunner's directive regarding that issue.")) Board members also were familiar with Directive 2010–74, which requires that the Board investigate whether there has been poll-worker error with respect to *NEOCH* ballots when multiple provisional ballots were voted in the correct polling location

but wrong precinct. (*See* Nov. 16, 2010 Bd. Mtg. Tr., JX 28, at 35–36 (discussion between Krisel and Faux regarding right-location, wrong table ballots and demonstrated poll-worker error); Hrg. Tr. 11–10 (Faux testifying he was aware of Directive 2010–74 when the Board met on November 16); Hrg. Tr. 11–210 to 211 (Krisel testifying that she showed Directive 2010–74 to the Board when they were looking at provisional ballots; that it was discussed at a meeting; and that staff had asked for clarification on how to determine poll-worker error).)

The Board also knew of similarities between provisional voting at the Board office and voting in the correct multi-precinct voting location but wrong precinct table within that location—namely, that in both cases voters arrived at the correct place and relied on the poll workers to give them the correct ballot. (Compare discussion in which Faux asks about right-location, wrong precinct voting and expresses concern that voters were in the correct place but were given incorrect precinct information by poll workers (Nov. 16 Bd. Mtg. Tr. at 36–37) with similar discussion in which Mallory explains that some voters at the Board office received wrong-precinct ballots because "for whatever reason [staff] may have looked up the wrong precinct as they looked at the current address and a former address. And they have looked up the wrong precinct or pulled the wrong ballot ... and give[n] it to the voter." (*id.* at 43).) Despite knowing these similarities, the Board concluded that circumstantial evidence consisting of the facts attendant to voting in a particular location constituted "demonstrated" poll-worker error with respect to ballots cast at the Board office but not at polling locations.

In a post-hoc attempt to rationalize this different treatment, the Board argues that there are differences between provisional voting at the Board office and at polling locations, namely: (1) voters may cast a provisional ballot at the Board office for only one reason—they have changed their address and did not notify the Board of the change prior to the close of registration—whereas voters may cast a provisional ballot at a polling place for eight different reasons; and (2) voters appearing at the Board office go to a counter where a Board staff member looks up the voter's precinct in the Board's voter registration system and then hands them a ballot, whereas voters appearing at multi-precinct polling places have to choose which precinct table to go to.

Neither of these differences is material in comparison to the key similarities: the voter is in the correct place to cast a valid ballot, he orally tells the poll or staff worker his address, and the worker uses that information to determine in which precinct the voter ought to cast his ballot. In its post-hearing brief, the Board inadvertently highlights the similarities when it argues, "[at polling locations,] the determination that the voter was in the right or wrong precinct was made based on the information that the voter provided to the poll worker .... [W]e have no way of knowing ... [what] address [the voter provided] to the poll worker ..., [or] whether the poll worker looked up the address correctly." (Doc. 186 at 13–14, *see also id.* at 7, n. 8.) This is nearly identical to the way a staff person at the Board office determines a provisional voter's precinct: "the voter orally tells the Board worker their address ... and then the Board worker looks it up in the ... voter registration system ... that has the same information that's in the Green Book." (Hr'g Tr. (Krisel) 1–76.) In both cases, "[a]bsent talking to the ... workers that actually looked up the addresses of the voters," we have no way of knowing if the error was the voter's or the poll/staff worker's. (Doc. 186 at 13.)

Defendant's argument that Plaintiffs have not presented evidence to overcome the presumption that the poll workers did their job correctly misses the point. The point is that *the Board* concluded that there was sufficient evidence to overcome that presumption with respect to wrong-precinct ballots cast at the Board office *but not* with respect to wrong-precinct ballots cast at correct polling locations. The Board came to these differing conclusions because it did not apply a uniform standard in determining what evidence "demonstrated" poll-worker error. In both situations, the worker could have made a mistake typing in or looking up the voter's address, or the voter could have made a mistake in telling the worker his or her address. (Hr'g Tr. (Krisel) 1–77.) No one asked the Board office staff whether a voter may have made a mistake in telling the staff person his address. (*Id.* at 1–88.) The Board simply concluded from the circumstances that the error was the workers', not the voters'. The most reasonable explanation for why a voter presenting either at the Board office *or* at the wrong table in the correct voting place would get a wrong precinct ballot is because the poll/staff worker made a mistake. The Board has not articulated any rational basis for treating the two scenarios differently, thus its insistence on a higher standard of proof for finding "demonstrated" error in one place but not the other violates the rule set out in *Bush v. Gore:* that "[h]aving once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." 531 U.S. at 104–05, 121 S.Ct. 525.

Significantly, the evidence showed that multi-precinct voting creates great pressures on poll workers, who are expected to learn a complicated provisional voting process and navigate an obfuscatory address book after a mere three-hour training course. Poll workers in these circumstances are more likely to make mistakes in processing provisional voters than Board staff working at the Board office, where a staff person need only enter a voter's address into a computer to discern which ballot to provide. These facts expose the inconsistency of the Board's position that there was "demonstrated poll-worker error" with respect to ballots cast at the Board office, but not at multi-precinct polling locations where voters cast their ballot in the correct building but at the wrong table. There was no direct evidence of poll-worker error in either instance.

The majority of the Board members made a snap decision that there was no demonstrated poll-worker error as to the wrong-precinct ballots cast at correct polling locations despite not even knowing how many of the 849 provisional ballots were voted in the correct polling location. This decision is perplexing given the Board's knowledge that Directive 2010–74 required it "question poll workers ... to determine whether they followed the board's instructions for ensuring that voters were directed to the correct precinct" when multiple provisional ballots were voted in the correct polling location but wrong precinct. (*Id.* at 49–50.) In other words, the Board rejected out-of-hand any possibility that poll-worker error could have led to ballots being cast in the right location but wrong precinct even before learning how many ballots fell into that category.

In sum, the Board did not apply uniform standards when it considered circumstantial location evidence as demonstrating poll-worker error. Had the Board applied uniform standards when it met on November 16, 2010, it would have told staff to determine how many wrong precinct ballots were voted in the correct location and voted to remake and accept for counting all those ballots. The Board needed no information or "evidence" other than what

it had on that date in order to make that decision.

Following the November 16, 2010 vote, this litigation ensued and the Board—at this Court's direction—proceeded to undertake additional investigation into whether poll-worker error was the cause of fatal flaws found on other provisional ballots. The Court now recognizes that this additional investigation was not necessary to support a conclusion that equal protection demanded that the Board consider right-location, wrong precinct ballots on the same terms as ballots cast at the Board office.[30] Nonetheless, during that investigation, the Board unearthed direct evidence of additional ballots having been miscast or not counted because of poll worker or staff error. Poll workers testified that they did not properly direct voters to the correct precinct (seven ballots), and staff discovered an additional nine ballots that were cast in the correct precinct all along but had been mislaid in a "do not count" bin. Because the Board on November 16, 2010 decided it would accept for counting ballots cast in the wrong precinct because of circumstantial evidence that demonstrated poll-worker error, the Board must include for counting all ballots for which there is direct evidence of poll-worker or staff error since the law does not distinguish between these two types of evidence for these purposes.

The post-election investigation into poll-worker error also revealed certain patterns with respect to the provisional ballots cast at polling locations on election day. Board member Caleb Faux discovered that many ballots cast in the wrong precinct were cast by voters who lived on streets that passed through more than one precinct. Similarly, Faux discovered that many ballots cast in the wrong precinct were cast by voters whose precinct was determined by whether the voter lived on the even- or odd-numbered side of the street. Plaintiffs urge the Court to hold that these ballots also should be counted, asserting that poll-worker error was the cause of these ballots being miscast. To the extent that these ballots were cast in the right location but the wrong precinct, the Court agrees. However, to the extent these ballots were cast in the incorrect location, they are not similar to the provisional ballots cast at the Board office or in the correct location but wrong precinct. Again, for the purpose of Plaintiffs' equal protection claim, the Court is concerned with the information the Board had or should have had at the time it met on November 16, 2010 for the purpose of voting on the provisional ballots.[31] The

---

**30.** The Ohio Supreme Court was correct when it noted that "[a]t best, any equal-protection claim would have merely required the same examination that the board conducted in concluding ... that 27 provisional ballots cast in the wrong precinct at the board of elections ... should be counted even though they were cast in the wrong precinct due to poll-worker error." *Painter*, 128 Ohio St.3d at 32, 941 N.E.2d 782. Indeed, no further investigation was necessary for the Board to conclude that provisional ballots cast in the correct location but at the wrong precinct table should be counted. (The Court obviously disagrees with *Painter*'s subsequent conclusion that the evidence available to the Board in November 2010 was insufficient to demonstrate poll-worker error with respect to these correct-location, wrong precinct ballots.)

**31.** The Court did not need to consider additional evidence in order to reach its decision that all 269 right location, wrong precinct ballots should be counted. However, the evidence received at the hearing supports the conclusion that these ballots were cast in the wrong precinct because of poll-worker error. Specifically, 134, or 50%, of these ballots were addressed with particularized evidence from either a poll worker or voter. (Doc. 182–1 Table A; Table N.) This evidence showed that in no case did a poll worker direct a provisional voter to another table within the building and the voter refused to go to that other table. In other words, in

breakdown of even/odd and pass-through addresses is not information that would have been readily available to the Board at that time. Further, the criteria that made provisional voting at the Board office and correct polling locations so similar—that the voter was in the correct building to cast a valid ballot—is not present in those situations where the voter is not in the correct location and would have to travel elsewhere in order to cast a valid ballot. Accordingly, the Court is not persuaded that wrong-location, wrong-precinct ballots should be counted.

## B. *NEOCH*

 The Court finds that the Board violated the *NEOCH* Consent Decree when it failed to (1) require staff to separate out ballots cast by voters who used the last four digits of their social security number as identification and who cast provisional ballots in the right location but wrong precinct or which had an incomplete affirmation and (2) question poll workers associated with those provisional ballots as required by that Decree. The first error occurred when staff did not consider ballots as *NEOCH* ballots if poll workers checked the "YES ID PROVIDED" box on the provisional ballot envelope, even when the ID provided was the last four digits of the social security number. The error was then compounded when staff did not separate out the above-specified ballots or question workers as the Decree requires.

As for the NEOCH ballots cast in the correct location but in the wrong precinct, the evidence brought forth at the hearing demonstrates that poll-worker error was the reason for that fatal flaw, and these ballots should be counted.[32] To the contrary, there was insufficient evidence presented at the permanent injunction hearing for the Court to conclude that poll-worker error was the reason certain voters did not complete the affirmation statement on the provisional ballot envelope. The Court hereby orders the Board to comply with the requirements of the *NEOCH* Consent Decree and undertake the investigation required by that Decree with respect to the ten *NEOCH* ballots that lacked complete affirmation statements.

## C. Due Process

The Complaints in this case generally allege that Defendants violated Plaintiffs' right to due process of law.[33] Plaintiffs have since specified that they are alleging a denial of both substantive and procedural due process rights. The Court will separately address each claim.

### 1. Substantive Due Process

Through the course of this litigation, two distinct substantive due process arguments have emerged. First, Plaintiffs allege that the Board's failure to count provisional ballots cast in the wrong precinct due to poll-worker error violates the Due Process Clause. Second, Plaintiffs contend that the Board's policy of failing to adequately supervise poll workers with respect to the

each of these cases, poll workers erroneously allowed voters to vote in the wrong precinct, either because they mistakenly thought the voter was in the right precinct or they mistakenly thought they did not have to direct the voter to the correct precinct for the vote to count.

**32.** There are fifteen right-location, wrong-precinct *NEOCH* ballots. (Doc. 182–1 Table J.)

**33.** Hunter's Complaint states: "Defendant Hamilton County Board of Election's system of rejecting provisional ballots is so unfair that it denies or fundamentally burdens Ohioan's fundamental right to vote." (Doc. 1, ¶ 39.)

processing of provisional ballots violates provisional voters' substantive due process rights. The Court will address each argument below.

### a. The Board's Failure to Count Ballots Cast in the Wrong Precinct

■■ Plaintiffs claim that the Board's failure to count provisional ballots cast in an incorrect precinct due to poll-worker error violates the Due Process Clause. Defendants argue that the Court must refrain from rendering a decision on Plaintiffs' challenge because Plaintiffs have failed to comply with Federal Rule of Civil Procedure 5.1. For the reasons that follow, the Court agrees with Defendants.

Rule 5.1 requires a party "drawing into question the constitutionality" of a state statute to promptly file notice with the state attorney general if the state or one of its agencies, officers, or employees is not a party to the action and to serve the notice and the papers raising the issue with same.[34] Fed.R.Civ.P. 5.1(a)(1)(B). Rule 5.1 also requires the Court to certify to the state attorney general that a statute has been questioned. Fed.R.Civ.P. 5.1(b). The state attorney general may then intervene in the action within 60 days after the notice is filed or after the court certifies the challenge, whichever is earlier. Fed. R.Civ.P. 5(c). Significantly, the court "may reject the constitutional challenge, but may not enter a final judgment holding the statute unconstitutional" until the time to intervene expires. *Id.* Thus, if a party calls into question the constitutionality of a state statute, the state attorney general must be given notice and an opportunity to intervene before the court can declare the statute unconstitutional.

At various points throughout this litigation, both Defendants and this Court questioned whether Plaintiffs were asserting a due-process challenge to Ohio's election laws. In their brief submitted prior to the permanent injunction hearing, Plaintiffs framed their argument as a challenge to Ohio election laws. Without referencing a specific statute, Plaintiffs argued that Ohio election laws, which provide that provisional ballots cast in the wrong precinct shall not be counted under any circumstance, generally are unconstitutional as applied to provisional voters whose ballots are cast in the wrong precinct due to poll-worker error. (Doc. 92 at 19–23.)

At the July 7, 2011 final pretrial conference, the Court expressed concern about the propriety of ruling on this due process claim without first providing the Ohio Attorney General with notice and an opportunity to intervene pursuant to Rule 5.1. At that time, Plaintiffs stated that it was unnecessary to comply with Rule 5.1 because they were not asking this Court to hold any Ohio statute unconstitutional. Rather, Plaintiffs explained, their due-process claim challenged the Board's *application* of state law, not state law itself. (*See* Doc. 100 at 13.) Consequently, the Court did not require Plaintiffs to provide the Ohio Attorney General with notice and an opportunity to intervene pursuant to Rule 5.1, and it allowed Plaintiffs to submit evidence on the due-process challenge at the permanent injunction hearing.

Having reviewed the evidence submitted at the permanent injunction hearing and the parties' pre-and post-hearing briefs, the Court is convinced that it cannot rule on Plaintiffs' challenge without ruling on the constitutionality of certain Ohio elec-

---

**34.** Earlier in this opinion, the Court found that the Board functions as an arm of the State of Ohio with respect to its review and counting of provisional ballots. Although the issue is not raised by Plaintiffs, the Court is not inclined to hold that the Board is agent of the State of Ohio for purposes of Rule 5.1, and, hence, responsible for bearing the entire burden of defending the statutes at issue.

tion laws. Despite Plaintiffs attempt to characterize the claim otherwise, the argument is inextricably intertwined with Ohio election laws. For example, R.C. § 3505.181(C)(1) delegates to poll workers the duty to ensure that voters vote in the correct precinct:

(C)(1) If an individual declares that the individual is eligible to vote in a jurisdiction other than the jurisdiction in which the individual desires to vote, or if, upon review of the precinct voting location guide using the residential street address provided by the individual, an election official at the polling place at which the individual desires to vote determines that the individual is not eligible to vote in that jurisdiction, *the election official shall direct the individual to the polling place for the jurisdiction in which the individual appears to be eligible to vote,* explain that the individual may cast a provisional ballot at the current location but the ballot will not be counted if it is cast in the wrong precinct, and provide the telephone number of the board of elections in case the individual has additional questions.

R.C. § 3505.181(C)(1) (emphasis added). Conversely, R.C. § 3505.183(B)(4)(a)(ii) provides that provisional ballots cast in the wrong precinct shall not be counted under any circumstance:

(4)(a) If, in examining a provisional ballot affirmation and additional information under divisions (B)(1) and (2) of this section, the board determines that any of the following applies, the provisional ballot envelope shall not be opened, and the ballot shall not be counted:

* * *

(ii) The individual named on the affirmation is not eligible to cast a ballot in the precinct or for the election in which the individual cast the provisional ballot.

R.C. § 3505.183(B)(4)(a)(ii) (emphasis added). Thus, to the extent that R.C.

§ 3505.181(C)(1) delegates to poll workers the duty to direct voters to the correct precinct and R.C. § 3505.183(B)(4)(a)(ii) provides that provisional ballots cast in the wrong precinct shall not be counted under any circumstance, those provisions, as applied to situations where evidence of poll-worker error exist, are fundamentally unfair to voters. Thus, the Court cannot hold that the Board's correct application of Ohio law, that is, not counting ballots cast in the wrong precinct due to poll-worker error, is unconstitutional without passing upon the constitutionality of these provisions.

Although not previously addressed by this Court, such a result was also contemplated by the Sixth Circuit, which noted:

[W]e have substantial constitutional concerns regarding the invalidation of votes cast in the wrong precinct due solely to poll-worker error. Ohio has created a precinct-based voting system that delegates to poll workers the duty to ensure that voters, provisional and otherwise, are given the correct ballot and vote in the correct precinct. Ohio Rev.Code Ann. § 3505.181(C). Ohio law also provides, as the Ohio Supreme Court recently held in *Painter,* that provisional ballots cast in the wrong precinct shall not be counted under any circumstance, even where the ballot is miscast due to poll-worker error. Ohio Rev.Code Ann. § 3505.183(B)(4)(a)(ii); *Painter,* 941 N.E.2d at 794. Arguably, these two provisions operate together in a manner that is fundamentally unfair to the voters of Ohio, in abrogation of the Fourteenth Amendment's guarantee of due process of law. *See Warf v. Bd. of Elections of Green Cnty.,* 619 F.3d 553, 559–60 (6th Cir.2010) ("The Due Process clause is implicated, and § 1983 relief is appropriate, in the exceptional case where a state's voting system is fundamentally unfair." (internal quotation marks omitted)).

Ohio has created a system in which state actors (poll workers) are given the ultimate responsibility of directing voters to the right location to vote. Yet, the state law penalizes the voter when a poll worker directs the voter to the wrong precinct, and the penalty, disenfranchisement, is a harsh one indeed. To disenfranchise citizens whose only error was relying on poll-worker instructions appears to us to be fundamentally unfair. *Cf. Purcell [v. Gonzalez]*, 549 U.S. [1] at 4, 127 S.Ct. 5[, 166 L.Ed.2d 1 (2006) ] ("[T]he possibility that qualified voters might be turned away from the polls would caution any district judge to give careful consideration to the plaintiffs' challenges."). Particularly when there is evidence of poll-worker error, the categorical treatment of miscast ballots provided by Ohio law is troubling.

*Hunter*, 635 F.3d at 243–44.

Ultimately, Plaintiffs' due-process challenge calls into question the constitutionality of Ohio's statutory scheme and is not limited to the Board's application of Ohio law in the November 2010 election. Because the Court cannot rule on this claim without passing upon the constitutionality of Ohio election laws, the Court is bound by the language of Rule 5.1 and is disinclined to rule upon the issue in the absence of the Ohio Attorney General.[35][36]

#### b. Failure to Supervise Poll Workers

In Hunter's post-hearing brief, Plaintiffs allege for the first time a substantive due process violation stemming from the Board's alleged failure to supervise poll workers. (Doc. 183.) Specifically, Plaintiffs seek to hold the Board liable under 42 U.S.C. § 1983 for constitutional violations resulting from the alleged failure to supervise poll workers with respect to their processing of provisional voters, resulting in a large number of ballots being rejected for having been cast in the wrong precinct. For the reasons that follow, the Court finds in favor of Defendants on this claim. In the Court's view, Plaintiffs' claim is properly analyzed using the failure-to-train framework. To succeed on this claim, Plaintiffs must show (1) that the Board failed to adequately train or supervise poll workers; (2) that the failure to train or supervise amounted to a deliberate indifference to the rights of voters; and (3) that there is a direct causal link between the failure to train or supervise and the alleged constitutional deprivation. *See City of Canton v. Harris*, 489 U.S. 378, 385–88, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). A failure to train or supervise "amounts to 'deliberate indifference' where

**35.** Plaintiffs alternatively argue that the Court should not refrain from ruling on this issue because the Ohio Attorney General had constructive notice of this action on or before January 18, 2011, when the Ohio Attorney General filed with the Sixth Circuit an amicus brief on behalf of the Ohio Secretary of State. The Court rejects this argument for two reasons. First, in the Court's view, the requirements of Rule 5.1 are mandatory and cannot be satisfied by constructive notice. Second, although the Ohio Attorney General submitted an amicus brief to the Sixth Circuit addressing Plaintiffs' equal protection claim on January 18, 2011, the Court is unwilling to hold that the Ohio Attorney General had notice of Plaintiffs' due-process challenge, given that Plaintiffs did not fully articulate the due-process challenge to this Court until July 5, 2011 when the parties submitted pre-hearing briefs.

**36.** Plaintiffs' due-process challenge to R.C. §§ 3505.181(C)(1) and 3505.183(B)(4)(a)(ii) is not forfeited. Rule 5.1(d) makes clear that "[a] party's failure to file and serve the notice, or the court's failure to certify, does not forfeit a constitutional claim or defense that is otherwise timely asserted." Fed.R.Civ.P. 5.1(d). In fact, it may suffice to notify the Ohio Attorney General and allow him to intervene in any subsequent appeal of this order. *See Oklahoma ex rel. Edmondson v. Pope*, 516 F.3d 1214, 1216 (10th Cir.2008).

state actors should have known, either because of a history of due process violations or because such likelihood was obvious, that due process violations were likely to result absent better training." *See League of Women Voters of Ohio v. Blackwell,* 432 F.Supp.2d 723, 729 (N.D.Ohio 2005), *aff'd in part, rev'd in part League of Women Voters of Ohio v. Brunner,* 548 F.3d 463 (6th Cir.2008) (citing *Harris,* 489 U.S. at 390 n. 4, 109 S.Ct. 1197).

 Upon review of the evidence, the Court finds that Plaintiffs have not met their burden of proving that the Board demonstrated deliberate indifference to the constitutional rights of voters. Even assuming that Plaintiffs could prove that the Board's supervision of poll workers was inadequate, Plaintiffs failed to produce evidence that such inadequacy resulted from the Board's deliberate indifference.

The evidence produced by Plaintiffs on this claim is scant. First, Plaintiffs seek to support their claim with statistics from the Ohio Secretary of State indicating that since 2006, the Board has rejected between 7.6% and 10% of all provisional ballots in Hamilton County as being cast in the wrong precinct.[37] This, Plaintiffs argue, put the Board on notice that "there was an unacceptable level of ballots being cast in the wrong precinct in previous elections" and thus required the Board to "take steps to determine the source of those wrong precinct ballots." (Doc. 183 at 2.) Plaintiffs argue that the Board failed to take steps to identify and correct the problems related to these rejected wrong precinct ballots.

Plaintiffs also point to testimony elicited at the hearing which revealed that many testifying poll workers failed to follow their training with respect to provisional voters. Plaintiffs then point to testimony demonstrating that many testifying poll workers made mistakes with respect to certain provisional ballots. While Plaintiffs acknowledge that the Board had "excellent training materials," they fault the Board for failing to administer formal testing of poll workers "to learn if the training took root."[38] (*Id.* at 3.) Plaintiffs allege that the Board failed to ensure that poll workers followed the procedures outlined in the Comprehensive Manual on Election Day. Plaintiffs further allege that the Board failed to take steps to identify poll workers "who consistently erred in determining the correct precinct for provisional voters." (*Id.* at 9.) Plaintiffs claim that the Board could have taken steps to improve supervision of poll workers, including implementing performance evaluations for poll workers and presiding judges and contacting poll workers from locations with high wrong precinct rejection rates to discuss the causes of miscast ballots.

Taken together, Plaintiffs proffered proof does not demonstrate either "a history of due process violations" or an obvious "likelihood . . . that due process violations were likely to result" absent better train-

---

**37.** In 2006, 12,569 provisional ballots were cast in Hamilton County. PX 2017. The Board rejected 2,238 of those provisional ballots, 1,329 of which were rejected as being cast in the wrong precinct. *Id.* In 2008, 17,489 provisional ballots were cast. *Id.* The Board rejected 4,007 of those provisional ballots, 1,767 of which were cast in the wrong precinct. *Id.* In 2009, 5,221 provisional ballots were cast. *Id.* The Board rejected 719 of those provisional ballots, 397 of which were cast in the wrong precinct. *Id.* In 2010, 10,-536 provisional ballots were cast. *Id.* The Board rejected 1,537 of those provisional ballots, 849 of which were cast in the wrong precinct. *Id.*

**38.** It is undisputed that the Board did not administer formal testing as part of the 2010 poll worker training program. Rather, Board director Sally Krisel testified that poll workers were given four "hands-on exercises" at those training sessions, two of which dealt with provisional voting. (Krisel 12–22.)

ing or supervision. *League of Women Voters of Ohio*, 432 F.Supp.2d at 729. Bare statistics, without more, do not make such a showing. And, although Plaintiffs suggest that a pattern of violations occurred in the same Hamilton County polling locations, Plaintiffs do not support this assertion with location-specific evidence from prior elections.[39] Board Director Sally Krisel did testify that she was aware of how many wrong precinct provisional ballots were rejected in other Ohio counties in the November 2010 election because it was "a topic that we talk about at our regular Secretary of State meetings. What types of things do other counties do to help cut down this—this situation [of wrong precinct voting]." (Hr'g Tr. (Krisel) 1–85.) However, without more, this testimony does not demonstrate the extent to which the Board was aware of specific problems that lead to ballots being cast in the wrong precinct, thus it does not prove the Board was deliberately indifferent to the rights of provisional voters.

As to the errors made by poll workers—and, to be sure, many errors were made—Plaintiffs failed to produce evidence demonstrating that, prior to the November 2010 election, the Board was aware that certain poll workers did not follow their training or that there were certain specific causes of miscast ballots. Also absent is any evidence proving that formal testing of

poll workers would have reduced the number of provisional ballots being cast in the wrong precinct. Consequently, the Court cannot conclude that the Board acted with deliberate indifference with respect to potential due process violations. In sum, Plaintiffs have not met their burden of proof on this claim. Defendants are entitled to judgment.

## 2. Procedural Due Process

■ Plaintiffs also allege that the Board deprived provisional voters of their right to procedural due process when it rejected provisional ballots cast in the wrong precinct without providing voters with notice and an opportunity to be heard. This claim fails because, in the Court's view, the harm that Plaintiffs allege is the direct result of the Ohio statutes in question, not the lack of process. Even if the Board had given provisional voters notice and an opportunity to explain the cause of their miscast ballots, Ohio law would have prevented the Board from counting those miscast ballots regardless of the explanation. Ohio law makes clear, as the Ohio Supreme Court held in *Painter*, that provisional ballots cast in the wrong precinct shall not be counted, even where the ballot is miscast due to poll-worker error. *See* R.C. § 3505.183(B)(4)(a)(ii); *Painter*, 128 Ohio St.3d at 27, 941 N.E.2d 782.[40] Thus, Plain-

---

**39.** Because polling locations and the precincts reporting to them sometimes change between elections, it is unclear whether it would be possible for Plaintiffs to show clear location-specific patterns regarding the cause of provisional ballots being cast in the wrong precinct.

**40.** As discussed earlier, the Board's decision to count some such ballots resulted in an equal protection violation. The cure to this violation requires the Board to count other ballots flawed by poll-worker error, the statute notwithstanding. Nor is "uncounting" the wrong-precinct ballots cast at the Board

office a satisfactory remedy. As the Sixth Circuit explained, the Board actually considered and counted four different categories of ballots flawed by poll-worker error: (1) the 27 cast at the Board office but in the wrong precinct, (2) 686 provisional ballots that were found to contain contradictory information regarding whether the voter provided identification, (3) 13 provisional ballots that had either no voter signature or only a partial name or no printed name in the affirmation, and (4) 4 provisional ballots cast at the Board office in which the ballots themselves were from the wrong precinct but the envelopes were from the correct precinct. It is not

tiffs' proposed post-deprivation remedy is inextricably intertwined with the validity of Ohio's election laws. It would be superfluous for the Court to order the Board to provide provisional voters with notice and an opportunity to be heard if Ohio law prevents the Board from counting miscast ballots regardless of the voter's particular circumstance.

The Court finds in favor of Defendants on this claim.

## V. CONCLUSION

Pursuant to the foregoing, the Court hereby issues a declaratory judgment and permanent injunction stating the following:

The Hamilton County Board of Elections violated provisional voters' right to equal protection under the law when, in determining whether provisional ballots were cast in the wrong precinct because of poll-worker error, it considered evidence of the location where provisional ballots were cast for some, but not all, provisional ballots cast in the wrong precinct.

The *NEOCH* Consent Decree is valid, and the Board failed to comply with the Decree when it processed provisional ballots following the November 2010 election. This failure resulted in the Board not counting certain provisional ballots that it was required to count.

Ohio's precinct-based voting system that delegates to poll workers the duty to ensure that voters are directed to the correct precinct but which provides that provisional ballots cast in the wrong precinct shall not be counted under any circumstance, even where the ballot is miscast due to poll-worker error, is fundamentally unfair and abrogates the Fourteenth Amendment's guarantee of due process of law. However, because Plaintiffs did not chal-

lenge the constitutionality of Ohio's election statutes, this Court is without jurisdiction to order a remedy.

Based on the foregoing: (1) the Board is enjoined from rejecting otherwise valid provisional ballots that were cast in the correct location but the wrong precinct; (2) the Board is enjoined from rejecting the nine ballots unanimously determined to have been cast in the correct precinct and the seven ballots unanimously determined by the Board to have been miscast because of poll-worker error; and (3) the Board is enjoined from rejecting the correct-location, wrong-precinct *NEOCH* ballots. These ballots shall be remade in accordance with the procedures adopted and previously implemented by the Board with respect to the 31 wrong-precinct ballots cast at the Board office. These ballots shall be included in the pending mandatory recounts as prescribed by O.R.C. § 3515.01. The Board shall count votes for the Juvenile Court Judge race as well as the other three races/issues on those ballots presently pending recounts in Hamilton County. Additionally, the Board is ordered to comply with the *NEOCH* Consent Decree and review any *NEOCH* ballots on which the voter did not complete or properly complete and/or sign the provisional ballot application as is required by the decree.

IT IS SO ORDERED.

possible to "uncount" all the ballots in those four categories. "Additionally, . . . it is preferable as an equitable matter to enable the exercise of the right to vote than it is to ignore the results of the investigation already undertaken." *Hunter*, 635 F.3d at 245.